(No. 12058.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRANK GROVE, Plaintiff in Error.

*Opinion filed June 20, 1918—Rehearing denied October 3, 1918.*

1. CRIMINAL LAW—*judgment will not ordinarily be reversed on facts depending on credibility of witnesses.* The law has committed to the jury the determination of questions of fact, and where the decision of a criminal case depends upon the credibility of witnesses, a judgment of conviction on the verdict will not be reversed on the facts unless the evidence clearly indicates a reasonable doubt of guilt.

2. SAME—*what weight should be given the testimony of an accomplice.* If an accomplice gives testimony which tends in any degree to exonerate himself or to lay the blame of the transaction upon another, or if it appears that he will gain in any way by his testimony, such facts should have great weight with the jury and the trial court, but the testimony of an accomplice may be of such a character as to carry with it an absolute conviction of its truth.

3. SAME—*what tends to show guilty knowledge of a defendant charged with receiving stolen goods.* On a trial for receiving stolen goods direct proof of guilty knowledge cannot often be obtained and is not essential, but proof of circumstances such as purchasing the property for less than its real value from an unknown person without inquiry as to the source of his title, or other circumstances which would induce a belief in the mind of a reasonable person that the property has been stolen, is sufficient.

4. SAME—*when instruction does not assume guilt of defendant.* An instruction stating that the object of the rule that the jury

must be satisfied of the guilt of the defendant beyond all reasonable doubt is to guard against the danger of an innocent person being unjustly punished and not to aid anyone to escape who is, in fact, guilty of the crime of which he is accused, is not objectionable as assuming the guilt of the defendant.

WRIT OF ERROR to the Circuit Court of Whiteside county; the Hon. FRANK D. RAMSAY, Judge, presiding.

JACOB CANTLIN, and HENRY C. WARD, for plaintiff in error.·

EDWARD J. BRUNDAGE, 'Attorney General, J. J. LU-DENS, State's Attorney, and ALBERT D. RODENBERG, for the People.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

A 1917 Ford touring car was stolen on November 5, 1917, from Thomas Kelly, in Rockford, and the next day it was brought to Sterling by John Stein and a companion, and the plaintiff in error gave his check, payable to John Stein, for $125 for the car. It was taken by Stein and his companion and Rufus C. Melvin to the farm of plaintiff in error's father, four miles from Sterling, and from there to the barn of Frank Pascal, in Round Grove, where it was found on November 25, 1917. When recovered the car was without tools, a tire and cushion, the spot-light and shock absorbers, and the original number 1,733,769 had been changed to 1,788,769 by altering each figure 3 to 8. Harry Knelsen and the plaintiff in error, Frank Grove, were indicted in the circuit court of Whiteside county for receiving the stolen property. Knelsen pleaded guilty and testified as a witness, and the plaintiff in error was convicted and sued out a writ of error from this court. He seeks a reversal of the judgment on the ground that the evidence was insufficient to prove that he received the car and knew it had

been stolen and on account of alleged errors of the court in instructing the jury as to the law.

The verdict was based upon the testimony of the accomplice, Harry Knelsen, and testimony and circumstances tending in some degree to corroborate him. The evidence given by Knelsen was contradicted by the defendant, who was also corroborated by other witnesses in some particulars, and there was evidence of his previous good character. Knelsen and Rufus C. Melvin were in the undertaking and furniture business in Sterling and John Stein brought the stolen car to the street in front of their store. Knelsen had been dealing in cars to some extent in the summer of 1917, several of which, at least, had been stolen. The defendant was an expert mechanic working for the Eureka Company in Rock Falls, opposite Sterling, in the auto department. He had been a chauffeur, and repaired autos, bought and sold cars and ran a taxi line. He had bought three Ford cars from Knelsen and an Overland car from Melvin and Knelsen, and there was evidence tending to prove that the cars previously bought from Knelsen were stolen. In buying cars the defendant made no inquiry about them, but he testified that when he bought the third car he was told by Knelsen that he was getting the cars from an insurance company in Chicago; that ninety days after a car had been stolen the company had to pay the owner the amount that it was insured for, and it had the cars on hand and he was getting them from the insurance company. Kelly paid $385 for the car in question in May before it was stolen. The defendant had bought five or six cars in 1917 and used some in his business and sold cars as he had opportunity.

Knelsen testified that when Stein brought the car to his place he went over to the Eureka Company, where the defendant was employed, and asked him if he wanted to buy a Ford car, and said that the man who had it wanted $150; that the defendant told him he would take it and to take

it to his father's farm but not until after four o'clock, as he was afraid the neighbors were getting wise that he was dealing in stolen cars; that the defendant came over to Sterling soon after noon and bought the car; that Melvin, Stein and his partners took the car out to the farm; that the defendant told him to come over after the 5:30 whistle blew and they would go out to the farm; that when they got to the farm the defendant told him that his mother said the sheriff had been there from Dixon looking for the car, and maybe he could sell it to Elmer Hess, a merchant of VanPetten; that they went over to VanPetten in the defendant's car and that he sat in the back seat of the car while the defendant was in the store; that after some time the defendant came out and asked him if he could not store the car, and he told him he knew a place at Round Grove, and they went back to the father's farm; that when they were there the defendant went into the house and brought out a lantern and a die for figures; that Knelsen held the lantern while the defendant changed the threes to eights; that they then went into the house and had supper and then left, and Knelsen took the car to Pascal's, at Round Grove; that he told the defendant they would have to give the man something for storing the car, and the defendant said the man could take the shock absorbers as it would help disguise the car, and that he sold other cars to the defendant which the defendant knew had been stolen. Knelsen took the car to the barn of Frank Pascal, in Round Grove, and slept in the barn until morning, when he took a train from Round Grove to Sterling.

The defendant denied any knowledge that the cars he had previously bought of Knelsen had been stolen, except as to Knelsen's statement when he bought the third car that he was getting them from an insurance company, and he testified that Knelsen came over to the Eureka plant and told him that he had a car for sale and the man that had the car was over at his store; that the man owed him

and wanted to sell the car so that he could pay up, and he wanted the defendant to furnish the money so that Knelsen could buy the car; that he went over to Sterling to dinner and saw the car in the street but did not give it any examination; that he stopped in the store and was introduced to Stein; that he asked Knelsen if Melvin would sign a note with him for security, but Melvin refused and Knelsen insisted on his buying the car, and he gave Stein a check for $125 with the understanding that Knelsen was to give him $150 when the car was sold, but the car was to be brought over to the Eureka plant, where they would clean it up and get it ready to sell; that he went back to the store at night and Knelsen told him he had sent the car out to his father's; that he asked Knelsen why he did that and told him he did not want the car there as they could not sell it out there; that he and Knelsen went out to the farm and had supper, but nothing was said about the Dixon sheriff being at the farm; that he did not tell Knelsen to deliver the car after dark or that the neighbors were getting wise; that he did not take the spot-light off or change the number on the engine and had no dies at the house; that they did not go to VanPetten that evening; that Knelsen did not tell him that two of Moore's crooks were there and wanted to sell the car; that he did not look at the car, as he would have if he had been going to buy it for himself, and that he did not know the car was stolen. He denied specifically every fact testified to by Knelsen tending to implicate him, and insisted that he merely loaned $125 to Knelsen and was to have $150 when the car was sold; that it was to be brought over to the Eureka plant, where they were going to clean it up and get it ready to sell, and when Knelsen did not come over he went to the store and objected to the car being at his father's farm.

The sheriff of Whiteside county testified to getting the car at the Pascal farm; that he asked the defendant what he paid for the car, and the defendant replied that he did

284 — 28

not buy it; that he asked the defendant what he paid for it, and he said $250; that he told the defendant that he gave his check for $125, and defendant then said he did buy the car and paid $125 for it and said nothing about having bought the car for Knelsen. Elmer Hess, a merchant at VanPetten, who dealt in cars, testified that the defendant did not come to him at any time during November with reference to the sale of a car to him. The defendant's mother testified that two men brought the car to the farm and Knelsen and the defendant came there a little after six o'clock; that defendant said to Knelsen that he wanted him to sell the car and get his money out of it; that he wanted his money back as soon as he could get it; that the spotlight was not taken off and no lantern was taken out of the house and that she never saw any die for numbering cars. There was considerable testimony that the defendant had previously enjoyed a good reputation for honesty.

Upon a review of the record in a criminal case, if it appears that there is clearly a reasonable and well founded doubt of the guilt of the accused the court will set aside the judgment notwithstanding the conclusion of the jury and the trial court, but the law has committed to the jury the determination of questions of fact, and where the decision depends upon the credibility of witnesses and the finding of the jury is endorsed by the trial court a judgment of conviction will not be reversed as not warranted by the evidence unless the court can say that the evidence clearly indicates a reasonable doubt of guilt. (*Steffy* v. *People,* 130 Ill. 98; *McCoy* v. *People,* 175 id. 224; *Gilman* v. *People,* 178 id. 19; *Johnson* v. *People,* 202 id. 53; *People* v. *Horchler,* 231 id. 566; *People* v. *Grosenheider,* 266 id. 324; *People* v. *Capello,* 282 id. 542.) It will at once be seen that the questions of fact in this case depended upon the credibility of the witnesses under the rule of law that testimony of an accomplice is to be received with caution and carefully scrutinized, and is only to be accepted where the jury,

after careful examination and consideration, are convinced of its truth. If an accomplice gives testimony which tends in any degree to exonerate himself or to lay the blame of the transaction upon another or it appears that he will be the gainer in any way by his testimony, such facts should have great weight with the jury and trial court, but his testimony may be of such a character as to carry with it an absolute conviction of its truth. In this case there is nothing to indicate that Knelsen expected, or had any reason to expect, any benefit to himself, and nothing he testified to tended in any degree to relieve himself or mitigate his punishment, but, on the contrary, he showed that he was the principal actor in the transaction. There were circumstances, also, which tended to corroborate him. Cars previously bought by defendant of Knelsen were recent models and were bought at $250 or $275 each without any inquiry, and this car, for which Kelly paid $385 in May, was bought for $125 from a stranger, also without any inquiry as to where it came from. The defendant objected to having the car left at his father's farm, and he gave as a reason for the objection that he could not sell it out there but it was to be brought to the Eureka plant and cleaned up for sale. At the same time it was taken to the Pascal farm at Round Grove and remained there some time while the defendant made no objection. It was not brought to the Eureka plant. Direct and positive proof of guilty knowledge cannot often be obtained and is not required, but circumstances such as purchases for less than the real value from an unknown person without any inquiry as to the source of his title, or other circumstances which will induce a belief in the mind of a reasonable person that property  has been stolen, are sufficient. (*Huggins* v. *People,* 135 Ill. 243; *Cohn* v. *People,* 197 id. 482; *Delahoyde* v. *People,* 212 id. 554.) The verdict and judgment cannot be set aside on the ground that a reasonable and well founded doubt of the guilt of the defendant appears from the record.

In the state of the evidence it was important that no error of law should be committed to the prejudice of the defendant, and it is argued that such errors were committed by the court in giving and refusing instructions. The objections are numerous and are argued with much ability, but they are mainly based upon refined distinctions and we do not find any that are substantial.

The second instruction related to the knowledge of one receiving stolen property that it has been stolen, and it is objected to on numerous grounds: (1) That it is argumentative; (2) that it assumes facts in evidence; (3) that it assumes that the defendant did, in fact, receive the property; (4) that it only requires a belief that the property had been stolen, while the law is that the facts must be such as would cause an ordinarily reasonable man to know and not believe; (5) that it is incorrect in stating that knowledge need not be derived from actual personal observation or information given by others who knew the facts of the stealing; and (6) that it is objectionable and ambiguous in using the words "such circumstances," in referring to the circumstances that would satisfy a man of ordinary observation that the car was stolen. The instruction is not subject to any of the criticisms. It advised the jury that if they believed, beyond a reasonable doubt, the defendant received the property, in determining whether he knew it had been stolen they were to consider all the facts in the case and the circumstances surrounding the transaction; that it was not necessary that knowledge should be derived from personal observation or personal information from others who knew the fact of the stealing, but the guilty knowledge might be inferred from facts in the evidence if at the time he received the property he knew facts which would impress a reasonable ordinary man with the belief that the property had been stolen, and if the defendant received the property under such circumstances as would satisfy a man of ordinary observation, intelligence and caution that it had been

stolen they would be authorized to find that the defendant knew that fact. The instruction is in accordance with the law as stated in the cases above cited, and a belief that property has been stolen, based upon facts and circumstances, is sufficient without personal observation or personal knowledge of the theft.

The third instruction relates to the testimony of an accomplice and is a copy of instruction 11 given in *People v. Frankenberg*, 236 Ill. 408, where it was held to be a correct statement of the law. The particular objection now made is that it does not say that Harry Knelsen was an accomplice, so that there is no connection between the propositions set forth in the instruction. If there were any substantial basis for the criticism it is answered by the fact that an instruction given at the request of the defendant states that Knelsen was an accomplice and that the jury ought to receive his testimony with great caution and scrutinize the same with great care.

It is alleged that the fourth instruction assumes the guilt of the defendant, but it merely states the law as uniformly given concerning the object of the rule that the jury must be satisfied of the guilt of the defendant beyond all reasonable doubt as intended to guard against the danger of an innocent person being unjustly punished but not intended to aid anyone to escape who is, in fact, guilty of the crime for which he is accused.

The seventh instruction is objected to because it requires that a doubt must be one that the jury can give a reason for and not a conjured-up doubt, and it is contended that one may have a reasonable doubt for which he can give no reason. While it is questionable whether instructions defining reasonable doubt add anything to the meaning of the words themselves, the instruction is not wrong.

The eighth instruction is objected to because it says that the law does not require the jury to believe that every material fact or circumstance in evidence has been proved be-

yond a reasonable doubt, which is not equivalent to saying that every link in the chain of evidence need not be so proved. The jury would only understand by the instruction that the law does not require every incriminating fact and circumstance to be proved beyond a reasonable doubt, and the fourth instruction given at the request of the defendant advised the jury that it was incumbent upon the prosecution to prove every material allegation in the indictment beyond a reasonable doubt. The jury could not have been led to believe that the ultimate material facts need not be proved beyond a reasonable doubt.

The court gave the ninth and tenth instructions as to the weight to be given to the testimony of the defendant, and they are objected to because they make no reference to corroborative testimony and because they cover the same ground. It is true they do cover the same ground and are substantially the same with a change of verbiage. Only one was necessary, but they do not in any manner exclude evidence corroborating the defendant.

Complaint is made that the court refused to give the tenth instruction asked by the defendant, stating that if the jury believed that Knelsen was induced to become a witness by any promise of immunity or any hope held out by anyone, the jury should take that fact into consideration in determining the weight to be given to his testimony. The evidence was that there had been no promise of immunity or that it would be easier for him if he implicated anyone else, and there was nothing in the case that would justify an inference on which the instruction could be based.

The twelfth instruction asked by the defendant and refused related to the testimony of Knelsen as an accomplice and was the same as the second instruction which was given.

No error was committed on the trial and every right guaranteed by the law to the defendant was observed.

The judgment is affirmed.        *Judgment affirmed.*