THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,
*v.* EVERETT BAYNES, Defendant-Appellant.

Fifth District    No. 78-443

Opinion filed August 28, 1980.

John H. Reid and Richard J. Bennett, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Victor Sondag, State's Attorney, of Waterloo (Raymond F. Buckley, Jr., and Martin N. Ashley, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE WHITE delivered the opinion of the court:

This is an appeal by the defendant, Everett Baynes, from separate convictions of burglary and theft, in the Circuit Court of Monroe County, Illinois. He was sentenced to a determinate term of five years on each offense, sentences to run concurrently. The cases have been consolidated on appeal.

On February 21, 1978, the defendant, Everett Baynes, was charged by information with theft of two automobile tires and wheels owned by Billy Long, having a total value of more than $150. The theft allegedly occurred on February 12, 1978. At the arraignment on February 21, 1978, the defendant pleaded not guilty and demanded a trial by jury. This case was denominated 78-CF-2, People of The State of Illinois v. Everett Baynes. The defendant changed his plea of not guilty to guilty on May 19, 1978, and was sentenced on August 31, 1978. A second information was filed against the defendant on March 10, 1978, alleging two counts of burglary of a

motor vehicle owned by Michael Walsh, and theft of two stereo speakers, having a total value of less that $150, owned by said Michael Walsh. Defendant was duly arraigned, pleaded not guilty, and demanded a trial by jury.

The defendant's trial was held on May 15, 1978. The People's evidence established that at approximately 1:30 a.m. on February 19, 1978, Michael Walsh had an accident with his 1972 pickup truck in rural Monroe County. The pickup truck was left alongside the road, as Walsh and his companions were driven to the hospital in a car which had been following them. When Walsh returned to his truck the next day he discovered three tires, two stereo speakers, which had been in the truck's cab, and a tachometer, which had been bolted to the steering column, were missing. Walsh identified, at trial, the tachometer as the one which had been in his truck; however, he *could not identify the stereo speakers.*

David McCoombe testified for the People explaining during his direct examination that while he had initially been charged, along with the defendant, with burglary of the Walsh truck, his attorney and the prosecutor had entered into an agreement, in exchange for McCoombe's testimony at defendant's trial, he would be charged with theft under $150 and that he would pay a $200 fine and court costs. McCoombe was a Missouri resident, and at the time of defendant's trial he was on probation in Missouri for theft under $50.

McCoombe testified during direct examination that at approximately 3 a.m. on February 19, 1978, he, his brother Jerry, Mark Barnett and Clayton Gardner left a Pizza Hut in Waterloo, Illinois, and drove to Valmeyer, Illinois, arriving there about 3:30 a.m. The group then observed defendant in his car, pulled over and talked with him. McCoombe had known defendant about one month. Defendant told them there was an overturned truck one-half mile out of town. They drove to see it, the McCoombe party following defendant's car. When they arrived, all of the men got out of their cars and looked around the deserted accident site for about five minutes before returning to Valmeyer. Nothing was then taken from the truck, and there had been no discussion of doing so.

The group met at a laundromat in Valmeyer, where according to McCoombe, the defendant asked him to return to the truck and remove the tachometer. Defendant told McCoombe he wanted it so he could give it to John Koch, who might want to use it for his police car. Koch was a part-time officer with the Valmeyer Police Department. The two cars then returned to the accident scene. At that time defendant again asked McCoombe to remove the tachometer, telling him what size wrench he should use to remove the bolts holding the tachometer to the steering column. Defendant neither entered the truck nor furnished any tools to be used by McCoombe in removing the tachometer. Defendant then drove down the road to his grandfather's house, having told the others that he would

act as a lookout. However, no "prearranged signal" was established prior to defendant's departure, and defendant did not have a C.B. radio in his car.

After defendant left, McCoombe climbed into the cab of the pickup truck through the broken rear window. Using a wrench, he removed the tachometer. It took him from 10 to 15 minutes to do this. While McCoombe was thus engaged, Mark Barnett took two truck tires and a tow strap which had been lying on the ground nearby, which he placed in McCoombe's car. The group then left for Valmeyer, McCoombe waving the tachometer out of the car window as they passed the defendant's parked car. McCoombe identified People's Exhibit No. 1 as the tachometer he had taken.

McCoombe drove to where Barnett's car was parked so the tires could be put in Barnett's car. McCoombe's brother and Clayton Gardner then went their separate ways. Barnett and McCoombe returned to the accident scene for the third time, taking one more tire. Defendant was not involved. The two then returned to Valmeyer where they met the defendant, and the three "went driving around." Defendant said he wanted the tachometer, but McCoombe refused to give it to him, saying he wanted it for his car. They drove around for the remainder of the early morning hours.

McCoombe also testified during direct examination that about one month after the items were taken from the truck, defendant showed him two car stereo speakers. The witness identified People's Exhibits Nos. 2 and 3 as being the speakers defendant had shown him. Defendant left the speakers with McCoombe and his brother. Then, on May 7, 1978, McCoombe gave them to Tammy Schofield, telling her to "take them back to Illinois." When Schofield left the McCoombes' home she had the speakers with her. This was corroborated by the testimony of Tammy Schofield.

Under cross-examination McCoombe admitted that approximately one month before trial he told defendant's counsel that he had found the tachometer under a rock in defendant's back yard. He further testified that defendant did not request him to lie. McCoombe also agreed that in exchange for the People's reducing the "felony charge of burglary down to a misdemeanor," he was required to testify against the defendant. Furthermore, he admitted that before the above agreement was entered into, the People had told him that they would not extradite him for trial if he promised to stay out of Illinois. On redirect, McCoombe testified that before the agreement was finalized, the prosecutor had warned him that if he perjured himself at defendant's trial, the agreement was "off" and he would be prosecuted for burglary.

Mark Barnett also testified for the People. He had known defendant for about six to eight months. While he corroborated much of David

McCoombe's testimony, Barnett's testimony also differed in certain respects.

According to Barnett, the group returned to Valmeyer after having merely looked over the accident scene, defendant opened the trunk of his car and showed him two stereo speakers, saying he had earlier taken them from the disabled pickup truck. The witness was not asked to identify the stereo speakers during the trial. He also testified that when the group went back to the scene for the second time, the only item taken was one tire, which Barnett placed in McCoombe's car. Clayton Gardner did not go with them the second time, as he had gone home. According to Barnett, the tachometer was taken during the third visit to the truck.

Barnett testified that when he arrived, defendant asked him to remove the tachometer. Barnett refused; then defendant asked David McCoombe to do it. McCoombe agreed. Defendant told McCoombe he wanted him to remove it because if it "came up missing John Koch would be looking for him." Barnett further testified before defendant left to station himself as a lookout, he took McCoombe to check the truck's glovebox because it might contain some "tapes." While McCoombe was inside the truck removing the tachometer, Barnett took a tow strap and two tires which were lying on the side of the road which he placed in the car. Barnett also identified the tachometer. Barnett testified that when McCoombe later refused to give the tachometer to defendant, defendant said "keep it down for a month or two because the police would be looking for it."

It was also developed during Barnett's direct testimony that he had pled guilty to theft of three tires taken from the truck and was sentenced to three days in jail. Barnett was subpoenaed to testify at defendant's trial, and he stated during direct examination that the State had not reduced any charges in exchange for his testimony. He had a prior conviction of theft less than $150.

On cross-examination the witness at first denied having ever given an account different from this trial testimony regarding his participation. He then admitted having earlier lied when he stated that he first saw the disabled truck when he and McCoombe were "coming back from Maeystown." He had given this account to the police on February 28, 1978. He also denied at trial that he and McCoombe made a final trip to the truck after the tachometer was removed.

Officer John Koch, a part-time policeman with the Valmeyer Police Department, also testified for the State. At approximately 2 a.m. on February 19, 1977, he received a radio dispatch regarding the truck accident. When he arrived at the scene there was no one present. At that time he observed the tachometer and stereo speakers inside the cab of the truck. At trial, he could not identify the tachometer or the stereo speakers, but did state that People's Exhibit No. 1 looked like the tachometer he had seen.

He then went into town to call the radio dispatcher and try to obtain more information about the accident. After this, Officer Koch drove out to the accident scene again. There was a group of about 15 people present when he arrived. Some of them were stopping momentarily, and then driving on. He testified the defendant was present. The officer had known the defendant for approximately four months, the relationship being of a social nature and not involving "official business." They had frequently talked about "cars and girls, [and] whatever was going on in town at the time."

After arriving at the scene the second time, Koch and defendant discussed the accident and where the truck's occupants might be. During their conversation the defendant commented that the truck's tachometer "would look good in his car." On direct examination the officer could not recall whether the defendant made any specific comment regarding the tachometer and Koch's police car. Koch then drove back to Valmeyer and attempted, but failed, to arrange for a wrecker to tow the truck into town. Later that same morning, Koch drove back out to the truck observing that the tachometer, the two stereo speakers, and the tires were gone. On cross-examination Koch testified that he thought the conversation with the defendant occurred during the policeman's first visit to the disabled truck, the defendant having arrived with another man soon after Koch got there. He also testified that the defendant might have been there during his second visit, when the crowd of people was present. During Koch's first visit, while he was conversing with defendant, defendant pulled the car keys from the truck's ignition and handed them to Koch. After defendant commented about how nice the tachometer would look in his car, Koch responded that "it would look good in the police car or any other car." Koch also admitted during cross-examination that he could have said to defendant, in jest, that if anything turned up missing from the truck he would know who to question, meaning defendant.

That afternoon Koch was at a Valmeyer gasoline station when defendant drove up and bought some gas. When defendant "spun his tires" as he drove away, Koch pursued him. He pulled the defendant over and "chewed him out about spinning his tires," which violated a city ordinance. He also asked defendant if he knew anything about the tachometer or other items which had been taken. Koch testified that defendant told him that he knew where the tachometer was, but would not tell him where. Koch told defendant that he (Koch) would be financially responsible for the missing items if they were not recovered. Later that same day defendant brought the tachometer to him. Defendant told Koch he had retrieved it from the trunk of a car, but did not identify the car's owner.

Deputy Sheriff Gary Seidler testified that after defendant brought the tachometer in, he questioned him, first advising him of his *Miranda* rights.

Defendant told him that he had seen the speakers in the truck, but did not know where they were. At first he told the officer that he was not present when any of the items were taken, but then admitted he was there when the tires were taken but denied having taken anything from the truck. He also stated to the officer that he was parked a short distance down the road when McCoombe drove by and waved the tachometer at him. Defendant stated that after Officer Koch asked him to bring him the tachometer, he removed it from a styrofoam cooler in David McCoombe's car. According to defendant, this was his only contact with that item. Defendant's car was searched by the police, but nothing from the truck was discovered.

Charles Schofield and his sister, Tammy, testified for the People concerning the speakers. Charles Schofield testified that during the latter part of February he was present with defendant, Clayton Gardner, and another man at Gardner's house. At that time defendant showed him two speakers and said they had come from the pickup truck. The three men indicated to Schofield that they had removed the black casing from the speakers so they could not be "traced back." He testified that People's Exhibits Nos. 2 and 3 looked like the ones he had previously seen. Subsequently, he saw the speakers on many occasions both at Clayton Gardner's house and David McCoombe's house. On one occasion he observed them in David McCoombe's car and they were installed for use.

Tammy Schofield testified McCoombe gave her the speakers on Sunday, May 7, 1978, to take back to the defendant. She took them home and the next day took them to Gary Seidler's house. On the way to the Seidler home they saw the defendant and showed him the speakers. She testified she heard the defendant state in a "sort of mumblish manner, like those are the speakers."

Prior to defendant's trial, the defendant and his counsel entered into a written stipulation with the People whereby the defendant agreed to submit to a polygraph examination, and the results of the examination could be offered into evidence by either the prosecution or the defense.

The defendant underwent the polygraph examination on April 14, 1978. The examiner was Michael Musto, a polygraph examiner employed by the Illinois Department of Law Enforcement. Prior to administering the test, Musto obtained defendant's written consent and gave defendant a written statement of his *Miranda* rights, which defendant read and signed before he was tested. Musto testified regarding his qualifications, explained how polygraph examinations are conducted, and discussed the existing data regarding the reliability of the polygraph. He further testified that the machine itself was in working order, as he tested it prior to administering the examination to defendant.

Prior to administering the polygraph examination, a pretest interview was conducted by Musto. At that time defendant, commenting on the

events of February 19, 1978, stated that while he did not recall telling the others that he would drive down to his dad's house to act as a lookout, it was possible that he said that.

Musto testified that he had arrived at an opinion regarding the truthfulness of the relevant answers by defendant during the test. The relevant questions asked of defendant were:

> (1) "On or about February 19, 1978, did you show anyone the speakers that had been stolen from the overturned truck?"
> (2) "On February 19, 1978, did you have in your possession the speakers that were stolen from the overturned truck?"
> (3) "On or about February 19, 1978, did you tell McCoombe to take the tach from the overturned truck?"
> (4) "Besides the keys, did you remove anything else from that overturned truck?"

For each question the defendant answered "no." Musto testified, in his opinion, none of the defendant's answers were truthful.

Defendant made no objection to the introduction of People's Exhibit 4, the stipulation regarding the examination results. Nor did defendant enter any objection regarding the admissibility of the examiner's opinion that defendant had not been truthful in his answers.

After defendant's motion for a directed verdict was denied, he presented his case. Myra Hansell, defendant's fiancée, testified that on February 19, 1978, she was with defendant when Officer Koch pulled them over because defendant had "peeled out of" a gas station parking lot. She heard "most" of the conversation between the two men. The officer warned the defendant not to drive fast anymore or in the future he would issue him a ticket. She did not hear the two discuss the missing tachometer. She was subsequently with defendant when he obtained that tachometer from David McCoombe's car. She was with the defendant when he went to the Valmeyer City Hall and gave it to Officer Koch. She testified that upon receiving the tachometer, Koch told defendant, "I am not telling who I got it from."

Ms. Hansell also testified that about one month after the alleged burglary of the truck, she was present at a conversation that defendant had with Mark Barnett. At that time defendant asked him if he was going to testify for the People at his trial, and Barnett said he would not "because I haven't seen you do anything at all, and there is no way I would testify for Jacobsen because he is a prick." Ms. Hansell affirmed that those were Barnett's exact words. Dennis Jacobsen was the Monroe County State's Attorney. Barnett told defendant, at the time, that he never saw defendant in possession of the stereo speakers. The defendant then rested and moved again for a directed verdict, which was denied.

During closing arguments the prosecutor stated:

"Now if you have any doubt as to whether or not David-McCoombe or Mark Barnett are telling the truth about Everett Baynes telling David McCoombe to get the tachometer from inside the truck, remember the polygraph examiner's questions, 'On or about February 19, 1978, did you tell McCoombe to take the tach from that overturned truck?' Everett Baynes answered no. Musto's opinion. Lying."

After closing arguments were completed, the jury was instructed concerning the accomplice testimony and accountability. Regarding the polygraph examiner's testimony, the jury was instructed:

"You should not accept the test results and the examiner's opinion as conclusive of the issue before you. You should consider the results and the examiner's opinion along with all the other evidence in the case and give the polygraph examiner's opinion whatever weight and effect you think it reasonably deserves."

After deliberations, the jury returned with its verdict. The defendant was found guilty of burglary (count I), not guilty of burglary (count II), and not guilty of theft under $150 (count III).

A presentence investigation was made and a report filed. The sentencing hearing was conducted on August 31, 1978, in both cases, after a hearing was held on the defendant's post-trial motion in the burglary case. This motion was denied.

At the sentencing hearing it was brought out that defendant, at the time the crimes were committed in Illinois, was on probation for two forgery, second degree, convictions in Delaware. Defendant also had prior traffic convictions and was on probation, at the time of the Illinois offense, for "Failure to Stop at the Command of a Police Officer."

The court, after making specific findings, sentenced the defendant to a determinate sentence of five years in each case to run concurrently.

The court advised the defendant of his right to appeal, subsequently appointed another attorney to represent the defendant, granted the new attorney additional time to file a motion to vacate the guilty plea in the theft case. This motion was filed, an evidentiary hearing was held and the motion was denied. The main thrust of the motion was that the defendant was in a state of emotional shock as a result of the guilty finding in the burglary case, that he has had prior discussions of a possible guilty plea with his attorney, the decision was not made until after the guilty verdict in the burglary case and he believed he would receive probation.

The defendant presents three issues on appeal:

(1) the defendant was not proven guilty beyond a reasonable doubt;

(2) must the defendant be granted a new trial because results of a polygraph examination were used against him;

(3) should the sentences be reduced.

■■ The defendant was convicted of burglary on the theory of accountability. In order to establish guilt on the theory of accountability, it is necessary to establish that the defendant aided or agreed to aid another in the planning or commission of the offense, that such participation took place either before or during the commission of the offense and that defendant intended to promote or facilitate the commission of the offense. *People v. Menken* (1977), 54 Ill. App. 3d 199.

The facts in *Menken* are not too dissimilar from this case. In that case, six young men were riding in a van when the idea was conceived that a school should be broken into. All got out of the van, two broke into the school building while the defendant remained on a hill above the school. After the breakin, defendant assisted in loading various items in the van. There was some evidence that the defendant and the other three were acting as lookouts. The defendant testified and denied he was acting as a lookout. In *People v. Marx* (1919), 291 Ill. 40, 48, the supreme court stated:

> "A person who encourages the commission of an unlawful act cannot escape responsibility by quietly withdrawing from the scene. It is not necessary that he should do some act at the time to constitute him a principal, but he must encourage its commission by act, or gesture, either before or at the time of the commission of the offense, with full knowledge of the intent of the person who committed the offense."

■■ The evidence in this case shows defendant, Baynes, initiated the idea of removing the tachometer from the truck and participated in carrying out the scheme even to the extent of suggesting the size of wrench necessary to accomplish that act. He could not quietly remove himself from the scene and escape liability.

The defendant argues the testimony of the accomplice witnesses is seriously suspect and insufficient to establish defendant's guilt. At common law the uncorroborated testimony of an accomplice was sufficient to warrant a conviction if it satisfied the jury beyond a reasonable doubt. This rule has always been followed in this State. *People v. Hermens* (1955), 5 Ill. 2d 277.

■■ If an accomplice gives testimony which tends, in any degree, to exonerate himself or to lay the blame for the transaction upon another or if it appears that he will be the gainer in any way by his testimony, such facts would have great weight with the jury and trial court, but his testimony may be of such a character as to carry with it an absolute conviction of truth. *People v. Grove* (1918), 284 Ill. 429; *People v. Williams* (1976), 65 Ill. 2d 258.

In the case at the bar, neither of the accomplice witnesses tried to shift

responsibility although both received promises of leniency from the State. Additionally, defendant was in possession of the stolen property shortly after the crime, along with McCoombe. If the possession is soon after the commission of the crime and is unexplained, there is a presumption, not of law but of fact, and of much force, that the one in possession committed the larceny. (*People v. Sturdyvin* (1922), 306 Ill. 138; *People v. Harris* (1972), 53 Ill. 2d 83.) Although the jury was not instructed on this matter, they were instructed "You should consider all the evidence in light of your own observations and experience in life" (Illinois Pattern Instructions, Criminal, No. 1.01 (1968) (hereinafter IPI)), and they were given the circumstantial evidence instruction (IPI Criminal No. 3.02). If the jurors are convinced of the absolute truth of the testimony of the accomplice along with the other evidence in the case, then they may accept the accomplice testimony as true. *People v. Grove.* It is a question for the jury to decide and unless from the record it is plainly apparent that the defendant was not proven guilty beyond a reasonable doubt, reviewing courts will not disturb the findings. *People v. Wilson* (1977), 66 Ill. 2d 346.

■■ The defendant argues the trial court committed reversible error in allowing the results of a polygraph examination to be admitted in evidence by stipulation of the parties. In the recent case of *People v. Monigan* (1979), 72 Ill. App. 3d 87, this court held it was reversible error to admit results of a polygraph examination where defendant timely objected. In the present case, a written "Stipulation for Placing Results of Polygraph Examination Into Evidence" was entered into by the parties. It was signed by defendant, his attorney, and the State's Attorney. Defendant was given his *Miranda* warnings before submitting to the examination. The examiner testified without objection by the defendant; the jury was instructed "that they should not accept the test results or the examiner's opinion as conclusion but should accept the results and the examiner's opinion along with all the other evidence." The defendant did not raise it as error in his post-trial motions. The defendant argues this is a distinction without any difference. We might agree with the defendant, except in this case the admission of the polygraph test did not have an "obvious prejudicial impact" on the jury. (*Monigan*, at 100.) Quite the opposite. Here the jury found the defendant "not guilty" on one count of burglary and of the theft of stereo speakers, ignoring the polygraph results and the testimony of several witnesses. It could be conceivably argued that the jury ignored the polygraph results in arriving at their verdict.

■■ Defendant argues the sentences are excessive and should be reduced by this court. The trial judge in this case is a capable and experienced judge with many years experience on the bench. The record shows in arriving at the sentence, he considered among other factors, the defendant's prior

history of criminality, his current probation status in Delaware, the need to deter others, the consistency between the instant offenses and defendant's prior convictions and defendant's failure to have previously made an effort to rehabilitate himself. The record shows the trial judge conducted a sentencing hearing in compliance with the Unified Code of Corrections (Ill. Rev. Stat. 1977, ch. 38, par. 1005—4—1). Further, the trial judge complied with Rule 61 of the Supreme Court Rules which provides:

> "In imposing sentence, a judge should follow the law and should not compel persons brought before him to submit to some act or discipline without authority of law, whether or not he may think it would have a beneficial corrective influence." (73 Ill. 2d R 61(c)(18).)

There is no question of this court's power to "reduce the punishment imposed by the trial court" (73 Ill. 2d R 615(b)(4)), but, absent an abuse of discretion, the sentence imposed by the trial court should not be altered. (*People v. Lykins* (1979), 77 Ill. 2d 35; *People v. Perruquet* (1977), 68 Ill. 2d 149.) Section 5—5—4.1 of the Unified Code of Corrections states, "The defendant has the right of appeal in all cases from sentences entered on conviction of murder or any other Class of felony, however, in all such appeals there is a rebuttable presumption that the sentence imposed by the trial judge is proper." (Ill. Rev. Stat. 1977, ch. 38, par. 1005—5—4.1. For a discussion of this section, see *People v. Choate* (1979), 71 Ill. App. 3d 267; *People v. Meeks* (1979), 75 Ill. App. 3d 357.) We have examined the record on appeal and find that the sentence was not an abuse of discretion (*People v. Lykins*; *People v. Perruquet*) and that the defendant has not rebutted the presumption that the sentence was proper. *People v. Choate*; *People v. Meeks*.

It would appear four felony convictions in less than two years should be enough.

Accordingly, we affirm.

KASSERMAN and HARRISON, JJ., concur.