THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL LEE, Defendant-Appellant.

Third District   No. 3—91—0936

Opinion filed July 20, 1993.

Mark D. Fisher, of State Appellate Defender's Office, of Ottawa, for appellant.

Raymond Kimbell III, State's Attorneys, of Galesburg (John X. Breslin and Terry A. Mertel, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BARRY delivered the opinion of the court:

Defendant Michael Lee was charged with attempted first degree murder (Class X), armed violence (Class X), unlawful use of weapons (Class 3) and mob action (Class 4). He was tried by the court and found guilty of attempted first degree murder, armed violence and unlawful use of weapons. The court sentenced defendant to serve concurrent terms of 18 years for the two Class X felonies and a concurrent term of five years for unlawful use of weapons. Defendant's

post-trial motion was denied, and he appeals from his convictions and his sentence.

The issues on appeal are: (1) whether the State's evidence was sufficient to prove defendant guilty of the three offenses beyond a reasonable doubt; (2) whether one of the Class X convictions must be reversed because both offenses were based on the same physical act; and (3) whether defendant's sentences are excessive.

At trial, the State established that on May 2, 1991, Theresa Jape lived in an apartment in a housing project in Galesburg with her son, Anthony Powell, Jr., and the child's father, Anthony Powell. Shortly after Powell came home around 3 a.m., Jape heard a rap on the door. At Powell's request, Jape asked who it was. She did not recognize the man she saw through the peephole or the name he supplied, "T." Jape returned to the bedroom, and Powell engaged the visitor in a heated conversation which erupted with a shotgun blast that shattered the glass storm door and sent glass and pellets flying into the living room. Powell then called the police and told them to be on the lookout for a small blue car occupied by four black males.

Just before daylight, the police stopped a blue Plymouth Colt hatchback on State Route 150 outside of Coal Valley. Defendant was at the wheel with two passengers—his brother, Terry Lee, and Terry's friend, Ulisher Slaughter. The officers' search of the car yielded a Winchester .12-gauge, sawed-off pump shotgun and two live shells.

State Trooper Thomas Matykiewicz testified that he later spoke with defendant at the Rock Island County jail. After waiving his *Miranda* rights, defendant told the officer that he had driven his brother from Chicago to Rock Island on the evening of May 1, 1991, because Terry did not have a driver's license. Terry was looking for his friend, Ulisher Slaughter, in connection with a cocaine transaction. According to Matykiewicz, defendant explained that Terry and Slaughter would buy cocaine in Chicago and then drive to Galesburg and sell it to people at the McKnight housing project. Then they would go to the Arsenal Courts housing project in Rock Island to party with "girls" until the money ran out. Defendant did not, however, admit that he sold drugs.

Matykiewicz further testified that defendant had told him that on the evening of May 1, when Slaughter was not found in Rock Island, he and Terry drove on to Galesburg. There, they found Slaughter in an apartment in the McKnight housing project. According to the officer, defendant said that he stayed at the apartment while his brother, Slaughter and another friend, "Anky," went out to sell drugs. When the three returned a couple of hours later, they complained of having

been ripped off for $100 worth of cocaine. They intended to get the money. Defendant then drove the three to another apartment in the housing projects and waited in the car while they proceeded to confront the occupant. Defendant heard a shotgun blast, started up the car, drove to the corner and waited until they all returned. They then drove Anky back to the McKnight apartment, and defendant, his brother and Slaughter headed north on Route 150 until their arrest. The officer testified that defendant had admitted to having been the driver all night, except for when he stayed at the apartment, and he was in fact the driver at the time of the arrest. Matykiewicz also stated that defendant initially gave his name as "Cary Lee," which the officer later learned was defendant's father's name.

Forensic testimony established that the shotgun recovered from the car had been used to fire the pellets that damaged Jape's apartment door. Other testimony established that over $300 worth of damage had been done to Jape's door and apartment as a result of the shotgun blast.

In his defense, defendant presented the testimony of Avery Matchem. Matchem testified that he was awakened early in the morning of May 2, 1991, by Terry Lee, who said he needed Matchem to drive him to Anthony "Anky" Powell's home. Accompanying Terry were Slaughter and defendant, whom Matchem had never previously met. Matchem complied by driving the three to Powell's apartment. According to Matchem, Terry was the only one who got out and went up to the apartment. Matchem testified that a short while after Terry gained entrance, he came flying back out, tripped slightly, and then came back to the car, removed what appeared to be a shotgun covered with a blanket from behind the back seat of the car, and told Matchem to wait. Terry went back to Powell's apartment and yelled "Anky." Then Matchem heard the shotgun blast. Terry returned to the car, and Matchem drove back to his neighborhood, got out and ran home. Defendant and the others drove off.

Defendant also testified on his own behalf. According to defendant, Terry drove the car from Chicago to Rock Island on the evening of May 1, 1991, and defendant went along for the ride. Terry was looking for Ulisher "Lish" Slaughter, who owed him money. Terry learned that Lish was in Galesburg. They got lost in Rock Island and were short on gas, so defendant paid for $3 worth of gas and they proceeded to Galesburg, arriving around 1 a.m. They found Slaughter, and Terry and Slaughter took off with some other people while defendant stayed at the apartment with a girl. After a while, Slaughter returned. Then Terry returned. Terry had a private conversation

with Matchem, and then Terry handed the car keys to Matchem and Matchem said, "Let's go." The four got into the car—Matchem behind the wheel, defendant in the front passenger seat, and Lish and Terry in the back. First, they went to the wrong apartment. When they found the right one, Terry went up to it alone and announced that he was "T." A few seconds after entering the apartment, the door opened and Terry fell out. He got up and returned to the car as Matchem was backing it up. Defendant saw Terry take something wrapped in a blanket from the rear of the car. The next thing he heard was a big "boom," and Terry came running back to the car. Matchem drove them to the intersection, stopped, said he'd see Terry tomorrow, and left on foot. Terry then got into the driver's seat and headed back toward Rock Island. However, when they got out of Galesburg Terry complained that his eyes were burning and asked defendant to drive.

Defendant testified that he knew nothing about the shotgun before Terry fired it at Powell's apartment. He denied having told Matykiewicz that he had been driving Terry's car all night. And he denied telling the officer that Terry and Slaughter were selling drugs or had been ripped off for $100 of cocaine. He said he knew nothing of any drug deal until after Terry found Slaughter that night. He said that Slaughter owed Terry money and Terry owed defendant and that was the reason they were looking for Slaughter. Defendant said that he didn't know Powell and had no clue as to why they went to his apartment. Defendant also said he was not familiar with Galesburg.

■ The State prosecuted defendant on an accountability theory. By statute, accountability exists when, "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, [defendant] solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1991, ch. 38, par. 5—2.) It is also the rule in Illinois that a defendant who joins a criminal enterprise is guilty of all crimes committed in furtherance of the enterprise. Guilt of an offense by accountability may be established even though the defendant's intended participation in the "common design" is to aid the principal in only one offense and he does not have the intent to commit other crimes in fact committed by the principal in furtherance of the planned or intended act. A common design may be inferred from the circumstances surrounding the commission of unlawful conduct. (*People v. Banks* (1985), 138 Ill. App. 3d 994, 486 N.E.2d 953.) Once a defendant is accountable, he remains so until he detaches himself from the criminal enterprise. (*People v. Ruiz* (1982), 94 Ill. 2d 245,

447 N.E.2d 148.) Accordingly, the driver of a get-away car may be found accountable for all the crimes committed by the principal. *People v. Gomez* (1984), 127 Ill. App. 3d 551, 469 N.E.2d 329, citing *People v. Baynes* (1980), 87 Ill. App. 3d 1000, 410 N.E.2d 894; *People v. Jones* (1980), 86 Ill. App. 3d 278, 407 N.E.2d 1121.

Applying these rules to the evidence in this case, viewed in the light most favorable to the prosecution (*Jackson v. Virginia* (1979), 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781; *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267), we cannot say that no rational trier of fact could have found the elements of attempted murder, armed violence and unlawful use of a weapon beyond a reasonable doubt. The evidence overwhelmingly proved that the offenses were committed by Terry Lee and that defendant was associated with his brother before, during and after they were committed.

Officer Matykiewicz' testimony relating defendant's statement on the date of the offenses established that defendant knew when he left Chicago that he was heading for Rock Island and Galesburg in furtherance of a cocaine-dealing operation with Terry and Ulisher Slaughter. The evidence, together with reasonable inferences, proved that part of the deal that night went bad, and a separate "collection" visit was planned. Although defendant said he had not participated in any drug sales, there was testimony that he continued his participation in the enterprise as the driver of the get-away car. Defendant admitted that "something wrapped in a blanket" was taken from the interior of the car he had been in, whether as a driver or a passenger, at various times throughout the night. After Terry fired the shotgun at the apartment, defendant made no attempt to disassociate himself from the enterprise, but drove away from the crime scene with his gun-wielding brother and Slaughter and gave a false name upon his eventual arrest.

■ In our opinion, the State's evidence and reasonable inferences from the evidence adequately established that defendant was an integral part of a common design involving the illegal distribution of cocaine and an enforcement mission in furtherance of the enterprise. As such, defendant was legally responsible as an accomplice for all offenses committed at Theresa Jape's apartment, notwithstanding defendant's assertion that he knew nothing of the weapon before hearing the blast and had had no intention to participate in violence.

Defendant next contends that one of his Class X convictions should be reversed under the principle of *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *i.e.*, a criminal defendant may not be convicted of more than one offense carved from a single physical act. It

is not disputed that a single firing of the shotgun by Terry Lee was the only act upon which the attempted murder and armed violence charges were brought. The State claims, however, that this issue was waived for failure to object in the trial court.

Given the seriousness of the offenses and the fact that defendant was not a principal in their commission, we choose not to apply the waiver rule. Accordingly, we reverse defendant's conviction for armed violence and vacate defendant's 18-year sentence for that offense. Further, because it cannot be determined from the record on appeal whether and to what degree the sentencing court may have been influenced by the armed violence conviction, we deem it appropriate to remand this cause for resentencing on the attempted murder conviction.

Lastly, we have considered defendant's challenge to his concurrent 18-year sentences for the Class X offenses. Defendant requests that this court exercise its authority under Supreme Court Rule 615(b)(4) (134 Ill. 2d R. 615(b)(4)) to reduce the sentence as unduly harsh. We recognize defendant's lesser participation in the serious offenses for which he stands convicted; however, we have reviewed as well the presentence report upon which the trial court based its sentencing decision. As did the trial court, we find it noteworthy that defendant had been paroled on another offense just a few days before the events giving rise to the instant convictions. Suffice it to say, defendant has a significant criminal history that justifies a greater-than-minimum prison sentence for his attempted murder conviction. Accordingly, we decline the invitation to reduce defendant's 18-year sentence on appeal, and we commend defendant's arguments to the trial court for consideration on remand.

For the reasons stated, we affirm defendant's convictions for attempted murder and unlawful use of weapons, and we reverse his conviction for armed violence. We vacate defendant's sentence for armed violence, and we remand for resentencing on attempted murder.

Affirmed in part; reversed in part and remanded.

STOUDER and LYTTON, JJ., concur.