THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
VINSON BANKS *et al.*, Defendants-Appellants.

Second District   Nos. 2—84—0392, 2—84—0420 cons.

Opinion filed December 4, 1985.—Rehearing denied January 8, 1986.

Daniel D. Yuhas and Allen H. Andrews, both of State Appellate Defender's Office, of Springfield, for appellants.

Daniel Doyle, State's Attorney, of Rockford (Robert J. Biderman and David E. Mannchen, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendants, Vinson (Rollo) Banks and Dexter (Lydell) Richardson, were charged by information in Winnebago County with two counts of murder in the August 4, 1983, death of Freddy Peterson. A third defendant also charged with the murder, Reginald (Scooter) Howard, was tried and convicted separately. The defendants here were jointly tried and convicted by a jury, and were separately sentenced to 20 years in the Illinois Department of Corrections. Their appeals were consolidated by this court.

The State's theory was that these defendants held Freddy Peterson's arms while Scooter Howard delivered the fatal stab wound. Defendants challenge the sufficiency of the evidence where the State's sole occurrence witness, 16-year-old Jackie Hill, was impeached by her subsequent written and oral statements exculpating the defendants. They further contend they were deprived of a fair trial by improper comments made by the prosecutor during rebuttal

argument which shifted the jury's attention from Jackie Hill's credibility to unsubstantiated allegations of illegal activity by defense counsel.

At trial, the State's key witness, Jackie Hill, testified concerning the events of August 3, 1983. She and her brother, Jeff Hill, saw Freddy Peterson during the afternoon. Freddy was the brother of Steve Peterson, Jackie's boyfriend. Freddy stopped on the street, and the three of them talked, and Jackie's aunt, Turina Cochran, joined them. Although she was Jackie's aunt, Turina was almost the same age as Jackie. Jeff left the group to go to Mary Neiber's house. At the time in question, Mary Neiber was Vinson Banks' girl friend. Freddy, Jackie, and Turina went driving around for a while and then went to Freddy's house, where they joined up with Steve Peterson.

The foursome listened to some music, then Jackie and Turina went out with Freddy and he bought some liquor. They drove around some more and went back to Freddy's house. In addition to Steve, Freddy's mother and little brother were there also. While the others drank rum, Jackie had a soda pop. About 11:30 p.m., Freddy, Jackie and Turina walked to Mary Neiber's house. About 15 minutes later, Scooter Howard, Turina's boyfriend, arrived. He was riding a dirt bike. When Freddy, Jackie, Turina and Scooter were on the porch, Turina introduced Scooter to Freddy as her boyfriend. The two men greeted each other, and Freddy began descending the porch steps, asking Jackie if he could use the phone at her house. On the way down, Freddy took a knife out of his back pocket, slashed the back tire of Scooter's dirt bike, and said, "Everything's cool." Scooter responded, "Yeah, man, everything's cool." Freddy then began talking about a gang called the Black Gangster Disciples, and he and Jackie started walking away toward her house.

Just about that time, the defendants here, Rollo and Lydell, drove up in front of Mary's house. As noted, Rollo, who was driving the car, was Mary's boyfriend at that time. When Scooter saw the two men driveup, he said something "smart" to Freddy, and Freddy walked back toward the porch. Jackie knew Rollo and Lydell and considered them friends. Scooter went to meet Rollo and Lydell by the curb; Freddy was standing on the porch steps. She heard Scooter saying to Rollo and Lydell, "We was gonna kick this punk's ass." Lydell asked Scooter what happened, and Scooter told them about the slashed tire. Lydell said, "Man, you want to kick his ass." Jackie testified she told them to leave Freddy alone because he was drunk, but that Lydell said, "No, we gonna kick this punk's ass."

The three men approached Freddy, Scooter took the knife out of

Freddy's pocket, and he began poking the opened knife at Freddy. Freddy jumped off the steps, removed a belt that he had worn around his neck, and began moving around, swinging the belt at Scooter.

Jackie testified she was telling Scooter and the defendants to leave Freddy alone, saying not to fight with the knife, but to have a fist fight only. She tried to grab Freddy but he pushed her out of the way. He started to back off, saying, "Everything cool, man, leave me alone." He then began running down the street. Scooter, followed by Lydell and Rollo, ran after Freddy. As Jackie ran after them, she saw Scooter stab Freddy twice in the back. The defendants were still running up behind Scooter. Freddy slowed down after he was stabbed. Scooter then ran around in front of Freddy. Lydell and Rollo were on each side of Freddy, holding his right and left arm, respectively, when Scooter stabbed him twice in the chest with the knife.

Jackie testified that immediately thereafter, she heard her sister, Crystal, call her name. She turned around, yelled "What?" and Crystal told her to come to where she was. Jackie refused and told her to come to where she was. She turned back around and started walking toward where Freddy had been, although she could not see him. Scooter and the defendants were walking toward her; she told Scooter that if Freddy was hurt, she was going to tell. Scooter said: "If you tell, you gonna get the same treatment." He and the defendants then continued walking back to Mary's house. Jackie testified she was going on to see how Freddy was, but Crystal kept calling her and she walked back down the street to where Crystal was near Mary's house.

Jackie and Crystal went inside Mary's house; Scooter and the defendants were there, along with Mary, Turina, and two other people, presumably two of Mary's three children. Lydell called Jackie names, and tried to talk to her. She told him to let her go. Scooter and the defendants then left the house, and left the area in the car in which Rollo and Lydell had arrived.

Jackie testified she was trying to stop crying, and that she, Turina, and Crystal went to see how Freddy was. They found him lying next to the curb on his stomach. His shirt was pulled up, exposing a portion of skin of his lower back. Jackie told Crystal to call an ambulance; the police arrived before the ambulance.

Crystal Hill testified that she was in her backyard hanging up laundry, when she heard people running, hollering, up the street. She went to the corner of Loomis and Sanford and saw her aunt, Turina Cochran. After she talked with Turina, she started moving up the street, calling for Jackie. She met Jackie, they talked, and then saw

Scooter, Rollo and Lydell walking together down the street. She testified she heard Scooter tell Jackie, "She get the same thing happen to her." They all then went to Mary Neiber's house. The three men left after about five minutes. Then she, Jackie, and Turina went to find Freddy. She testified she did not make a report to the police of what she had seen or heard, and that they did not question her specifically about the incident.

Officer Koelker, the first Rockford police officer on the scene, testified he found Freddy lying stomach-down on his side against the curb. His shirt was pulled up, exposing a portion of his back and the top of his undershorts. Koelker pulled the shirt up further, exposing two puncture wounds on the back of the body and two wounds on the front of the body. A black belt with a two-pronged buckle was found laying in the street about three to four feet away from the body. Recalled later on behalf of defendant Banks, Koelker testified Crystal Hill told him that she had been informed by her sister of the fight between Freddy and Scooter, that her sister was worried that Freddy was hurt, and that she (Crystal) went looking for him. She did not say anything to him about hearing people running and hollering, or about the threat made to Jackie by Scooter, but Koelker testified he did not ever take a formal written statement from her as to her knowledge of the entire incident.

Dr. Larry Blum, an associate pathologist, performed the autopsy on Freddy Peterson on the morning of August 4, 1983. He discovered two stab wounds in the back and two stab wounds in the chest. The wound in the left lower back was made before the wound in the right upper chest. Beyond that, Doctor Blum could not determine the order in which the wounds were inflicted. The wound to the right upper chest was the fatal wound. There were two other cuts, one on Freddy's right wrist and the other on Freddy's right thumb. Doctor Blum characterized these cuts as defensive wounds and stated that Freddy must have had free movement of his arms when they were inflicted. No bruises were found on Freddy's arms.

Doctor Blum testified that two tears in the back of Freddy's shirt corresponded to the wound in Freddy's back, assuming that the shirt was worn normally. There were also two tears in the front of the shirt, down toward the bottom. The width between the tears was much less than the width between the chest wounds. Doctor Blum testified that in his opinion, the shirt could not have been worn in a normal manner, tucked in the pants, and have those cuts correspond to the wounds on the body. He testified the stab wounds inflicted on the back would not be so debilitating that the person could not still walk

or run a distance.

Officer Irma Olson testified that at 12:40 a.m., on August 4, 1983, she went to Vinson Banks' house. She was admitted to the house by Banks' sister, and went to an upstairs bedroom where she saw Banks lying in bed, under the covers, with his eyes open. Richardson was lying on top of the bedcovers, and had to be tapped on the shoulder to be roused. Both men were fully clothed. She did not see any blood on them or their clothing.

Over continuing defense objection, Officer Chris Dickinson testified that she talked to defendant Richardson at 5:42 a.m. on August 4, 1983. Richardson told Officer Dickinson that he went to Mary Neiber's house with defendant Banks, had a couple of beers, and stayed for about an hour and a half. He did not see tires slashed or fighting; he left alone, and walked home. Richardson later told her that he had left the party with Banks when the fight started, and that the fight had probably been over a girl. At about 6:50 p.m., in another interview with Officer Dickinson, Richardson told her that he had not seen or been involved in a fight, and that "[t]hey took me home first." At 9 a.m., earlier that same day, Richardson told Detective Jeff Otwell that he did not remember much of the night before because he was "high" at the time. He said that he saw Scooter chase the victim down the street and that a short time later, Scooter came back. Richardson said he never saw a knife. He also said that Banks gave Scooter a ride, and that he was with them.

Jackie Hill was questioned extensively on cross and redirect examination concerning her written and tape-recorded statements in which she exculpated both defendants. The first such statement was written and signed by her on January 26, 1984, in the presence of Cynthia Fulson, Judi Levingston, and Melanie "Money" Scott, an employee of defendant Richardson's attorney, Earl Washington. Scott and Fulson shared a duplex with their children and Fulson's mother. Levingston was an acquaintance of Jackie Hill, and a friend of both Scott and Fulson.

In the statement, Jackie wrote that she was wrong when she told the police Lydell did it, and that Lydell and Rollo were not in Freddy and Scooter's fight. She wrote further that Lydell should not have given Scooter a ride home, but that they did not touch Freddy. She testified on cross-examination that when she wrote the statement, Melanie Scott told her she also would have to have a conference with and make a statement to Earl Washington, defendant Richardson's lawyer. Jackie further testified on cross-examination that several days later, on January 30, Melanie called her from her (Jackie's) cousin's

house and told her to meet her there. They then went to Melanie's house where attorney Washington was waiting, and she made a tape-recorded statement which was played for the jury and admitted in evidence as defendants' exhibit No. 2. Leave was granted to supplement these records on appeal with the tape.

In the tape recording, Jackie recounts the events preceding the stabbing consistently with her trial testimony. In response to attorney Washington's questions, however, she states she saw Richardson and Banks chase Freddy down the street, but did not see them touch or hold Freddy. When asked why she told a different story earlier, she said it was because the police kept asking her whether anybody else had something to do with it, and she was upset because the three of them—Scooter, Lydell and Rollo—had left together. She also said the police threatened that if she lied or withheld evidence that they would send her to a juvenile home. When attorney Washington asked her on the tape if she would be willing to go to court to give her statement, there was a notable pause and she quizzically responded: "I have to go to court?" She agreed to the necessity of it, but she expressed her worry that her mother would find out.

On further cross-examination, she testified she was neither angry with nor frightened of attorney Washington either at trial or at the time she made the tape recorded statement. She admitted she never told the prosecutor anything about either her written or recorded statement until March 16, 1984, when she was called to the prosecutor's office and asked about them. By that date, she had already testified in Scooter Howard's trial. She denied anybody in the State's Attorney's office said anything to her about perjury or punishment or the juvenile home in connection with her contrary statements. She stated she had asked " 'Money' [Melanie Scott] and them" about it before and that they said nothing would happen.

On cross-examination by defendant Banks' attorney, she stated that when she talked with Officer Pobjecky at the scene she did not say anything about either Dexter Richardson or Vinson Banks because he told her to wait until she got downtown. She did not give him any names at that time, but she told him there were two other guys with Scooter.

During redirect examination, she testified the first time she met Melanie Scott was outside a store called Juliano's. Melanie had passed by in a car and waited for Jackie at the corner. Melanie introduced herself to Jackie; she was with two people Jackie knew before that time, Judi Levingston and Cynthia Fulson. Melanie asked if she would talk to her about (Dexter) Lydell Richardson and Rollo (Banks); Jackie

testified Melanie did not tell her for whom she worked. Jackie got in the back seat of Melanie's car, they dropped some groceries off at Jackie's house, and proceeded to Melanie and Cynthia's duplex.

Jackie testified that once inside, Melanie asked her if she thought Lydell and Vinson (Rollo Banks) were innocent, and she said no. They then went into the kitchen; she and Melanie sat at the table. The other two women stood by the sink. Melanie then threw or tossed a pen and slid a piece of paper across the table to her and said: "I'm going to tell you what to write, and [you] write it." When Jackie protested that she would get in trouble, she said Melanie told her she would check first to see if she would get in trouble, and if she would, she would not give the statement to the prosecutor. Jackie testified Melanie told her to write that the police forced her to say the defendants were involved. She testified she wrote the statement as directed because she was afraid of Melanie.

On further redirect examination, Jackie testified she did not know that Melanie worked for attorney Washington until January 30 when Melanie picked her up for the interview with Washington. When she got to Melanie's house for the interview, James Richardson, defendant Richardson's brother, known to Jackie as "Bay-bay," was present, along with Mr. Washington's driver. She said she did not tell the truth on the tape because she was afraid of Melanie. She said her testimony at trial before the jury was the truth.

On re-cross-examination by attorney Washington, Jackie testified she was not frightened of him when she gave the statement and she remembered laughing and smiling and chatting with him before and after the statement. She said she did not recall Washington saying to "Bay-bay" that he wanted him to go into the kitchen and stay there throughout the entire interview. She remembered that no one said a word in the room except for herself and Washington. She said she was lying to attorney Washington and had "made it all up" when she talked with him about her mother having to find out and about the judge having to know. She said she also lied about the police making her say the defendants were involved, and that she did all of this lying because Melanie frightened her four days earlier. Even though she was frightened, she said she did not call the assistant State's Attorney and tell him because she did not want to.

Melanie Scott testified for the defense. She knew the defendant Richardson and his family and got Mr. Washington to represent him. She also began working for Mr. Washington about that same time. Washington directed her to interview Jackie in order to get her statement about the incident, and to have two witnesses present, one who

knew Jackie and one whom Melanie knew. She testified Washington instructed her not to tell Jackie what to write; to let her write it in her own handwriting, to let her spell by herself, and not to lead her in anyway whatsoever, and that she followed his instructions. She denied she threatened or intimidated her in any way and denied she told Jackie she would have to check with the prosecutor about the state-. ment. She said in the event Jackie agreed to give a statement, Washington instructed her to tell Jackie that she would have to talk with him also, and that she did advise Jackie of that fact. She testified the meeting between Jackie and Washington took place at her home on January 30, and that James Richardson was there because he had shown Washington's driver how to get to her house while she herself went to pick up Jackie. When they were all present, she said Washington told James Richardson to leave the room and he went into the kitchen. She said Jackie gave the statement freely and voluntarily.

On cross-examination, she testified that Jackie initiated the conversation on January 26. She told Melanie that she had made a big mistake, but was afraid to talk to anyone about it. She said Lydell and Rollo should not have given Scooter a ride, and that is why she said they were involved. Melanie denied she threw a pen and piece of paper at Jackie. She said Jackie began writing, but balled up the paper and started over again three times. She said Jackie was the one who suggested she could meet with Mr. Washington on Monday, January 30, after school.

On that date, Melanie went to Levingston's apartment. Neither Levingston nor Jackie, who was supposed to meet her, was there. Melanie went downstairs to Jackie's cousin's apartment and asked her to call Jackie. Jackie's cousin called Jackie and told her that Melanie was there and wanted to see her. Jackie arrived within five minutes. Melanie then drove Jackie to her apartment to meet with Mr. Washington.

Cynthia Fulson and Judi Levingston also testified for the defense. Their testimony essentially corroborated that of Melanie Scott, in that they stated Melanie did not throw a paper or pen at Jackie, nor did she tell her what to write. Levingston testified that Melanie identified herself to Jackie, and told her why she wanted to talk with her. She testified Jackie had to keep starting over when she wrote the statement. She did not hear Melanie intimidate Jackie in any way or offer her anything, nor did she herself do either of those things.

Mary Neiber testified under subpoena for the defense. She said that after Rollo and Lydell drove up in front of her house, she had a conversation with them about the fight going on between Freddy and Scooter. She testified she did not hear either of the defendants say to

Scooter in Jackie Hill's presence words to the effect that they were going to kick somebody or beat somebody. On cross-examination she testified that she received a subpoena from the State and was to have been in the prosecutor's office the day before, but that she did not make it there. She testified that Rollo was her boyfriend on August 3 and 4, 1983. She testified the defendants stayed for two hours after the fight.

Officer Sam Pobjecky was called on behalf of defendant Banks. He interviewed Jackie Hill at the crime scene, making notes of the interview. Jackie told him that Scooter and Freddy were fighting over Turina Cochran and that Freddy punctured Scooter's bike tire with a knife. Jackie told Officer Pobjecky that Scooter chased and stabbed Freddy. She said that Rollo and another person drove up in a car and that Scooter put his bike, a yellow and black dirt bike, in the car and they then drove away. Officer Pobjecky testified that Jackie then told him that she did not know any other information except that Scooter lived on the east side of town. The interview was then ended. Jackie never told Officer Pobjecky that Scooter threatened her or that Rollo and Lydell had held Freddy Peterson.

On cross-examination, he testified Jackie was upset during the interview and started screaming and crying and became hysterical when Freddy Peterson was pronounced dead during the course of their conversation. Officer Pobjecky did not ask her for a full account of the events. However, he stated on redirect examination that he was trying to find out the names or descriptions of all the individuals who may have been involved in the stabbing, and the only name he got from Jackie was Scooter's.

The jury found both defendants guilty of murder by accountability.

Defendants contend they were not proved guilty beyond a reasonable doubt because Jackie Hill was not worthy of belief, and the remaining evidence was either insufficient to prove them guilty or was exculpatory.

■ The due process clause protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which the accused is charged. (*In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068.) The court in *People v. Bell* (1983), 113 Ill. App. 3d 588, 591, considered its role in reviewing the adequacy of evidence to support criminal convictions:

> " 'The elementary but crucial difference between burden of proof and scope of review is, of course, a commonplace in the law. The difference is most graphically illustrated in a criminal

case. There the prosecution is generally required to prove the elements of the offense beyond a reasonable doubt. But if the correct burden of proof was imposed at the trial, judicial review is generally limited to ascertaining whether the evidence relied upon by the trier of fact was of sufficient quality and substantiality to support the rationality of the judgment. In other words, an appellate court in a criminal case ordinarily does not ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt, but whether the judgment is supported by substantial evidence.' *Woodby v. Immigration & Naturalization Service* (1966), 385 U.S. 276, 282, 17 L. Ed. 2d 362, 367, 87 S. Ct. 483, 486; see also *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (holding that when reviewing the sufficiency of evidence to support a State criminal conviction, 'the relevant question [under the due process clause of the fourteenth amendment] is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt')." (Emphasis in original.)

(See also *People v. Talley* (1981), 97 Ill. App. 3d 439.) The evidence must be viewed in the light most favorable to the prosecution, and the evidence of guilt cannot be disregarded on review unless it is improbable, inconclusive, or contrary to human experience. *People v. Stevenson* (1962), 25 Ill. 2d 361, 364-65; *People v. Ellis* (1978), 74 Ill. 2d 489, 496.

■ In order to establish a defendant's accountability for the offense of murder under section 5—2(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, pars. 5—2(c), 9—1(a)), the prosecutor must establish beyond a reasonable doubt that the accused solicited, aided, abetted, agreed, or attempted to aid another person in the planning or commission of the offense; that such participation took place either before or during the perpetration of the crime; and that this participation was with the concurrent, specific intent to promote or facilitate the commission of the offense. (*People v. Ruckholdt* (1984), 122 Ill. App. 3d 7, 10-11, citing to *People v. Grice* (1980), 87 Ill. App. 3d 718, *cert. denied* (1981), 450 U.S. 1003, 68 L. Ed. 2d 207, 101 S. Ct. 1714.) Further, while mere presence at the scene of the crime is not sufficient to demonstrate legal accountability for the commission of the offense, a person may aid or abet another without participating actively in the overt act. Of course, words of agreement are not essential to establish a common purpose to commit a crime be-

cause the common design can be inferred from the circumstances surrounding the perpetration of the unlawful conduct. In addition, although it is manifest that legal accountability for a crime is grounded on an accused's assistance prior to or during the commission of the criminal act, a defendant's conduct after the offense may raise an inference of prior or concurrent participation. *People v. Ruckholdt* (1984), 122 Ill. App. 3d 7, 10-11.

■ A jury's determination that a defendant is legally accountable for the criminal act of another will not be set aside unless the evidence is so improbable, unsatisfactory, or unreasonable as to warrant a reasonable doubt of the accused's guilt. (*People v. Grice* (1980), 87 Ill. App. 3d 718, *cert. denied* (1981), 450 U.S. 1003, 68 L. Ed. 2d 207, 101 S. Ct. 1714.) The testimony of one witness, if positive and credible, is sufficient to convict, even though it is contradicted by the accused. (*People v. Vriner* (1978), 74 Ill. 2d 329; *People v. Manion* (1977), 67 Ill. 2d 564; *People v. Novotny* (1968), 41 Ill. 2d 401.) Where that witness' testimony lacks credibility, the State must rely upon its circumstantial evidence to establish the defendant's guilt. (*People v. Thruman* (1977), 52 Ill. App. 3d 13, 16.) The testimony of a witness may be disregarded where there is an inherent improbability in his testimony or where there are so many omissions in his account as to discredit his whole story. (*People v. Skelly* (1951), 409 Ill. 613, 616; *People v. Davis* (1915), 269 Ill. 256.) It is not the duty or the privilege of a reviewing court to substitute its judgment as to the weight of disputed evidence or the credibility of witnesses, for that is for the trier of fact who heard the evidence presented and observed the demeanor of the witnesses; a conviction will be reversed only where the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Novotny* (1968), 41 Ill. 2d 401.) A reasonable doubt is one "based on reason which arises from the evidence or lack of evidence." *Johnson v. Louisiana* (1972), 406 U.S. 356, 360, 32 L. Ed. 2d 152, 158, 92 S. Ct. 1620, 1624.

The defendants contend that in view of the many conflicts in Jackie Hill's testimony, she was unworthy of belief. They point particularly to her initial statement to Officer Pobjecky in which she failed to incriminate them at a time when it would have been most likely that she would do so; *i.e.,* almost immediately after the occurrence. Defendants contend the failure to assert a fact when it would have been natural to assert it·has been considered to amount, in effect, to an assertion to the nonexistence of that fact. (*People v. Hughes* (1974), 17 Ill. App. 3d 404.) The State argues in response that her failure to implicate them was understandable, however, due to her upset condi-

tion at the time.

Although the hysterical condition of a witness has been considered to excuse a failure to assert or mention an obvious or important fact or identifying feature (see, *e.g., People v. Ross* (1976), 39 Ill. App. 3d 241), it is notable that the witness was not so hysterical that she totally omitted to mention the defendants' participation in the offense; rather, Officer Pobjecky testified she told him that Rollo and "another man" had driven away with Scooter. At trial, she testified she did not give the police at the scene either defendant's name, but had told them that two other men were involved. It seems improbable that she would only detail the defendants' participation in leaving the area with Scooter if, in fact, they had held Freddy's arms, allowing the knife-wielding Scooter open and unimpeded access to Freddy's chest. As the defendants suggest, it is more probable that the emotionalism of the moment precluded any fabrication of the event, thus lending a ring of truth to her statement that is similar to the guarantee of veracity afforded an excited utterance. Thus, the defendants assert Officer Pobjecky's testimony was crucial, in view of Jackie Hill's apparent willingness to fabricate versions of the instant offense.

The evidence which the defendants assert most rendered Jackie Hill an incredible witness was the evidence of her written and oral statements exculpating the defendants. Her only explanation for giving these exculpating statements was that she was afraid of Melanie. The validity of that explanation is substantially belied by the evidence, however. Jackie's testimony concerning the giving of the statements is totally devoid of any evidence that Melanie or any of the others threatened or coerced her into making them. Although presumably she was scared of Melanie, she herself was the one who suggested the date for the follow-up meeting with attorney Washington, and she arrived promptly when her cousin called to say that Melanie was there waiting for her. She never reported the alleged intimidation to her parents or to the State's Attorney's office, and the fact that she had made two contrary statements did not become known to the State's Attorney's office until sometime after she testified in Scooter Howard's trial. As the defendants note, it appears that Jackie Hill was willing to say whatever she believed the questioner wanted to hear.

■ Even disregarding Jackie's testimony that the defendants actively participated in the offense by holding the victim's arms, her remaining testimony, viewed in the light most favorable to the prosecution and, if believed by the jury, was nonetheless sufficient to support the jury's verdict that the defendants were guilty of murder by ac-

countability.

Jackie testified that the defendants had arrived together, were informed by Scooter of the hostilities between himself and Freddy, and that Lydell said, *"Man, you want to kick his [Freddy's] ass."* (Emphasis added.) Jackie testified she pleaded that they not fight because Freddy was drunk, and that Lydell, in effect, rejected her plea when he said, *"No, we gonna kick this punk's ass,"* and the three men—Scooter, Lydell and Rollo—approached Freddy. Scooter obtained Freddy's knife and began poking it at him. Freddy attempted to defend himself by swinging the belt he had worn around his neck at the three men confronting him. He then ran, imploring them to leave him alone, but the three gave chase. Particularly significant is the fact that even in her tape-recorded statement in which she exculpated the defendants, her version of the event was nonetheless consistent with her trial testimony in that her effort to de-escalate the fray by suggesting a fist fight only (*i.e.*, "Jump the boy, don't stab the boy"), was rejected by Lydell, saying, "No, no \*\*\*" (from the tape-recorded statement), and, "We was gonna kick his ass."

This evidence of the circumstances surrounding the commission of the act was sufficient to establish the defendants' guilt by accountability, even though the evidence was not sufficient to prove the defendants actually held the victim's arms. It is clear the common purpose of the threesome was to "kick [the] punk's ass" and that one of the three was wielding a knife and was poking it at "the punk." The defendants backed up Scooter when Freddy bolted and ran, much like hounds after the fox. After the fatal wound was inflicted, the defendants flanked Scooter as he walked away from the felled quarry and threatened Jackie with similar treatment if she exposed the deed. The defendants then provided Scooter and his dirt bike convenient transport away from the scene. Shortly later the defendants were found at defendant Banks' home together, clothed, one defendant open-eyed underneath the blanket and the other on top of the blanket, ostensibly asleep; indisputably unusual circumstances which suggest a consciousness of wrongdoing and imminent discovery.

■ Jackie's testimony was substantially corroborated by that of her sister, Crystal Hill, in that she heard people running and hollering up the street, she called Jackie back to her, they met and talked, she saw Scooter and the defendants together walking toward them, and she heard Scooter's threat to Jackie. Although the defendants presented Mary Neiber's testimony to the effect that she did not hear anyone within earshot of Jackie talking about beating or kicking anyone, she was unquestionably a recalcitrant witness, and at the time of

the offense was defendant Banks' girl friend. The evidence of the defendants' conduct in chasing after Freddy, and their decidedly supportive alliance with him after the fact were all circumstances properly considered by the jury in determining whether the defendants acted in aid of a common purpose. (*People v. Ross* (1981), 100 Ill. App. 3d 607, 610; *People v. Ruckholdt* (1984), 122 Ill. App. 3d 7, 10-11; *cf. People v. Butler* (1973), 16 Ill. App. 3d 248 (where the court reversed the respondents' judgments of delinquency for aggravated battery because the evidence failed to show they said or did anything, shared the principal's desire for revenge or ill will toward the victim, accompanied him to the scene of the offense, or fled with him afterward).) " '[P]roof of a common purpose need not be supported by words of agreement but can be drawn from the circumstances surrounding the commission of an act by a group' (*People v. Richardson* (1965), 32 Ill. 2d 472, 476)." (*People v. Tate* (1976), 63 Ill. 2d 105, 109.) From the evidence, it appears the mere arrival of the two defendants on the scene, innocent though it may have been, served to embolden Scooter to take on Freddy in the first instance, and that the defendants' conduct thereafter only served to escalate the confrontation. It cannot be said the defendants were "merely present" or "negatively acquiesced" in the occurrence where the defendants helped Scooter present a united front against Freddy, chased him down, and provided not first aid for the mortally wounded victim but, rather, transportation for his attacker. One may aid and abet without actively participating in the overt act, and if the proof shows the defendant was present at the crime without disapproving or opposing it, the trier of fact may consider this conduct in connection with other circumstances and reach a conclusion that such person assented to the commission of the criminal act, lent his countenance and approval and was thereby aiding and abetting. *People v. Richardson* (1965), 32 Ill. 2d 472; *People v. Bunting* (1982), 104 Ill. App. 3d 291, 294.

In sum, we conclude that the jury could justifiably have found the defendants guilty of several additional culpable acts beyond that of merely holding the victim's arms which supply the requirements for their conviction on an accountability theory (see *People v. Tate* (1976), 63 Ill. 2d 105) and, thus, the State's evidence was sufficient to prove them guilty beyond a reasonable doubt.

The defendants' second contention is that they were denied a fair trial as a result of allegations of wrong-doing leveled at their attorneys by the prosecutor during his rebuttal argument. Defendants contend the argument improperly shifted the jury's focus from the question of Jackie Hill's credibility to the conduct of their attorneys in

securing from her the statements exculpating them.

██ The State responds this issue has been waived, and we agree. Neither defendant objected to the State's remarks at trial; defendant Banks made an oral motion for a new trial; no argument was presented thereon. Defendant Richardson filed a boiler-plate post-trial motion which did not include this issue as error.

An unobjected to nonspecific oral motion for a new trial preserves for review all errors which appear properly preserved in the record. (*People v. Pearson* (1981), 88 Ill. 2d 210, 217; *People v. Whitehead* (1966), 35 Ill. 2d 501.) However, the failure to object to alleged prejudicial remarks at trial, thereby failing to preserve the error on the record, waives the issue on appeal unless the comments are so inflammatory that the defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process. (*People v. Bramlett* (1985), 131 Ill. App. 3d 616, 620; *People v. Owens* (1984), 102 Ill. 2d 88, 104.) Further, where the grounds for a new trial are stated in writing, the accused is limited on review to the errors alleged therein and all other errors are deemed to have been waived. (*People v. Pickett* (1973), 54 Ill. 2d 280; *People v. Nelson* (1968), 41 Ill. 2d 364.) The failure to object at trial or in a post-trial motion to remarks made in closing argument has been held to constitute waiver of the issue. *People v. Lucas* (1981), 88 Ill. 2d 245; *People v. Jackson* (1981), 84 Ill. 2d 350.

██ In its discretion, however, a reviewing court may consider the assignment of error, even though no objection was interposed in the trial court and no ruling was made or preserved thereon, where the evidence is evenly balanced or where the nature of the remarks is such as to deprive an accused of his constitutional rights. (87 Ill. 2d R. 615(a); *People v. Lucas* (1981), 88 Ill. 2d 245; *People v. Weinstein* (1966), 35 Ill. 2d 467.) A court of review will grant relief if the trial error is so prejudicial that real justice has been denied, or the verdict of the jury may have resulted from such error. *People v. Carlson* (1980), 79 Ill. 2d 564, 577.

However, in this case the evidence is not closely balanced and, furthermore, no error is apparent.

In its rebuttal argument, the State "prayed" that the jury would not be deceived by defense counsel and claimed that the defense tampered with the evidence, and that had the defense let the evidence alone, the State would not have had any problems proving that the defendants were guilty.

"Mr. Washington talked about prayer, well, prosecutors pray too. We pray that justice is done, and we also pray that juries

not be deceived. We pray that you do not get caught up in the deception and that you see the truth. And that is all we are hoping for here. Mr. Washington says we have prosecution problems in this case. We welcome this evidence just as it is. If they had left the truth alone and not picked up Jackie and tried to force her to change her statement, we would have no problems."

The State charged that the defense was attempting to corrupt the legal system:

"Mr. Washington talked about he didn't want our system to get corrupted [*sic*]. Well, that is exactly what they are trying to do with that tape and that piece of paper. Jackie Hill was scared. All this testimony about her smiling, telling jokes, it is padding. And they need to tell you that. I have got to congratulate Mr. Washington and his cohorts because they got her at ease and they got her to change her story."

Finally, the State charged that the two statements stank of coercion:

"You know, I have not read transcripts back to the last century, but I can, like you, smell intimidation and coercion when I see it, and those statements, that tape, and that piece of paper stinks [*sic*] of coercion."

From the record, it appears that the State's remarks were made in response to defense counsel's closing argument in which he acknowledged that he could understand the prosecution's consternation when it was confronted with a witness who had to admit that she was lying. Defense attorney Washington then stated:

"It is regrettable that her explanation for her lie is that I and people associated with me would attempt to corrupt her and, by so doing, our system."

Later, he said:

"I would not want this [presumably the tape-recorded statement] if it were not true. She had every opportunity to step away from it. Even if she had come the next day and said I want it back, I'd be glad to give it to her. And I regret that she would imply that we tried to force her because she [*sic*] didn't."

Defense counsel defended his taking of the statement from Jackie Hill:

"There is nothing illegal or unethical in my taking a statement from this witness. There was nothing illegal or unethical in my sending agents to take a statement from this witness. I tried to do it in the fairest possible atmosphere that I could. And I be-

lieve the Court will tell you under our system of justice a lawyer not only has a right to interview a witness but, to my belief, if he is to obey the constitutional mandates to effectively represent his client, he has the duty to evaluate the evidence, interview the witnesses. This was done here. And the truth sprang forth. And thank God that it did.

* * *

I told you and asked you in the beginning that I would be trying to prove that she lied, and I begged you not to hold it against me because I know she is a young teenager. But the truth can never be sacrificed. A person's age, or their gender, if she lied, it's my duty to expose it."

The prosecutor's comments were obviously made in order to rebut defense counsel's comments, and they were reasonable inferences drawn from the record. This was not a case such as *People v. Emerson* (1983), 97 Ill. 2d 487, relied upon by defendants, in which the court disapproved of comments by the prosecutor which intimated that defense counsel fabricated a defense theory, tried to free his client through trickery or suborned perjury, where there was no evidence at trial from which such impropriety could be inferred.

Here, a major portion of the trial was devoted to exploring the circumstances surrounding the diametrically opposed out-of-court statements and in-court testimony given by the State's chief witness. A primary issue at trial was whether Jackie Hill felt coerced by the defense attorney and persons under his direction into exculpating the defendants, or whether she was lying at trial because she had been caught in a lie.

In sum, the defendants have waived this issue, but in the alternative, were we to consider the merits of the issue, we conclude the prosecutor's rebuttal argument was not improper, and defendants were not deprived of a fair trial thereby.

The judgments of the circuit court of Winnebago County in cases Nos. 84—392 and 84—420 are affirmed.

Affirmed.

SCHNAKE, J., concurs.

JUSTICE REINHARD, specially concurring:
While I agree with the result and most of the analysis set forth in this opinion, I disagree with that portion of the opinion as it pertains to Jackie Hill's credibility. It was the jury's responsibility to resolve

the contradictory evidence and factual disputes and weigh the credibility of the witnesses. (*People v. Kubat* (1983), 94 Ill. 2d 437, 468.) As the fact of an inconsistent extrajudicial statement does not, *per se*, destroy the probative value of testimony, the trier of fact may accept the credibility of the witness notwithstanding the impeaching inconsistent statement. (*People v. Pavelich* (1979), 76 Ill. App. 3d 779, 782.) The fact that a witness has changed his testimony does not conclusively destroy his testimony, but is only a factor to be considered by the trier of fact in passing upon the credibility of such a witness. *People v. Nelson* (1965), 33 Ill. 2d 48, 52-53; *People v. Hobson* (1979), 77 Ill. App. 3d 22, 24-25.

The reality of the circumstances here is that 16-year-old Jackie Hill was living in the same neighborhood as the friends and relatives of the defendants. Her reluctance to initially incriminate fully the defendants shortly after the homicide is explainable due to her immaturity and emotional upset. The officer also said he did not ask her for a full account of the events. Her subsequent statements to Melanie Scott and attorney Washington, which were inconsistent with her trial testimony, are understandable under the circumstances. Melanie Scott knew one of the defendants and his family and actually arranged for attorney Washington to represent the defendants. She then was engaged as a paid investigator for Washington and sought out young Jackie Hill. Jackie testified she gave a statement to Scott as directed because she was afraid. At the location of the later second statement to attorney Washington, Melanie was present as was one of the defendant's brothers. She testified she was still afraid of Scott.

There is strong evidence in this record that Jackie Hill's inconsistent extrajudicial statements were the result of pressure and coercion exerted on her by friends and relatives of the defendants. It was for the trier of fact to make this determination, not this court sitting in review without the benefit of observing the witnesses. Therefore, I would not disregard Jackie Hill's testimony that the defendants actively participated in the offense by holding the victim's arms as the majority has found.