THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ROBERT WATTS, Defendant-Appellant.
Fourth District   No. 4—86—0905

Opinion filed June 16, 1988.

Daniel D. Yuhas and John J. Hanlon, both of State Appellate Defender's Office, of Springfield, for appellant.

Donald M. Cadagin, State's Attorney, of Springfield (Kenneth R. Boyle, Robert J. Biderman and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

The defendant, Robert Watts, appeals his convictions for murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)), aggravated battery (Ill. Rev. Stat. 1985, ch. 38, par. 12—4), aggravated unlawful restraint (Ill. Rev. Stat. 1985, ch. 38, par. 10—3.1), and obstructing justice (Ill. Rev. Stat. 1985, ch. 38, par. 31—4(a)). In support of his appeal, the defendant claims: (1) he was not proved guilty beyond a reasonable doubt based upon an accountability theory; and (2) the court erred in denying his motion to reconsider the sentence imposed.

We affirm the defendant's conviction and sentence.

On July 2, 1986, the defendant was charged by information with five counts of murder, one count of aggravated battery, one count of aggravated unlawful restraint, and one count of obstructing justice. Codefendant, Dennis Sperow, was likewise charged. The charges were based upon an incident which allegedly occurred on June 10, 1986, resulting in the death of Linda Faye Robinson. The case proceeded to jury trial and on October 30, 1986, the defendant was convicted of the four offenses. Codefendant Sperow was tried separately, subsequent to the defendant's conviction. On November 24, 1986, the defendant's post-trial motion was denied and the defendant was sentenced to

terms of 30 years for murder, five years for aggravated battery, four years for unlawful restraint, and one year for obstructing justice. On December 22, 1986, the court denied the defendant's motion for reconsideration and reduction of sentence, as well as a supplemental motion for a new trial. The defendant filed a timely notice of appeal.

At trial, the State presented Springfield police officer Scott Allin, who testified that at approximately 5:15 p.m. on June 10, 1986, he received a call from William Bunch, an acquaintance and former neighbor. Bunch indicated that his stepson, the defendant, was very upset and needed to speak with Allin. Bunch then brought the defendant to Allin's home, whereupon the defendant told Allin he had witnessed a murder and could take Allin to the scene of the crime. Allin immediately called his supervisor and was informed that the Springfield police department had no knowledge of such an incident. The defendant proceeded to direct Allin to a rural and desolate area in the northeast section of Springfield.

Upon arrival at the scene, the defendant directed Allin to the approximate area where the body of a Negro female could be found. Allin went to that area and discovered the severely beaten, nude body of a deceased black female. He also observed a bloodstained, large, football-sized piece of concrete laying near the body. Allin immediately contacted the police department informing them of the incident and requesting appropriate personnel to be dispatched.

While waiting for the arrival of other law enforcement personnel, the defendant told Allin that he and Dennis Sperow had picked up the woman near 13th and Jackson with the intent of having sex with her. The defendant further indicated that he did have sex with her and then Sperow took her into a wooded area. A short time later, the defendant claimed he heard thumping and wrestling noises, and believed that Sperow had severely injured or killed the woman. The defendant told Allin that Sperow was a friend of his, but that he did not know him very well, and was in fact scared of him.

Springfield police officers John Workman and William Sowers established that the body was that of Linda Faye "Ebony" Robinson. Workman stated that he had previously arrested and fingerprinted Robinson, and Sowers, an evidence technician, stated the fingerprints on the body matched those of Robinson.

The physical evidence recovered at the scene of the incident included a large piece of cement which was located three feet west of the body, a wig, a shirt, a single tennis shoe, a knife, and a pair of pants. The distance between the victim's body and the roadway was measured at approximately 73 feet.

At approximately 5:30 p.m. on June 10, 1986, the defendant made a second statement to Springfield police officer Frank Natale. The defendant was still at the scene of the incident. At trial, Natale testified as to the defendant's statement. The defendant said he and another man had been in the area with the black female. The woman approached the defendant and told him that the other man had stabbed her. The woman then ran into the weeds and the defendant followed her. There, she asked the defendant to protect her. The defendant stated he then walked back toward the other man with the intention of taking the knife away from him. At this point, the other man ran past the defendant carrying a large object which the other man used to hit the woman.

The defendant said nothing to Natale about holding the girl down or how far away from the girl he was when she was hit by the object. The defendant indicated that he had neither participated in nor had any desire to assist in the killing.

At approximately 5:40 p.m., the defendant made a third statement to Springfield police officer Tim Young. The defendant was still at the scene of the incident. After receiving *Miranda* warnings, the defendant informed Young that he and Dennis Sperow had picked up the black female in the area of 13th and Jackson in Springfield. They then drove to the deserted area to have sexual intercourse. The defendant had sexual intercourse with the woman first and then Sperow did the same. While Sperow was having intercourse with the woman, he stabbed her. The defendant indicated to Young that he had witnessed the stabbing. The woman then took off running across the railroad tracks. According to the defendant, Sperow then picked up an object and went after the woman. Shortly thereafter, the defendant heard a large thumping sound and assumed that Sperow was striking the woman with the object. The defendant informed Young that he had not been involved in any of the acts against Robinson and that he did not know Sperow very well.

Dr. Grant Johnson, pathologist and coroner's physician for Sangamon County, testified that he examined the body of Linda Faye Robinson at the scene of the incident. Johnson observed several stab wounds to the body, and noted severe damage to the woman's head. Johnson also observed a red substance on the piece of concrete found lying near the woman. He noted a seven-inch depression in the mud below the woman's head. Johnson, who later took part in the autopsy of the body with Dr. John Dietrich, noted no defensive wounds on the woman's hands. Johnson estimated the time of death to be between 2 and 6 a.m.

Dr. John Dietrich testified that the chest of Linda Faye Robinson exhibited five stab wounds. The head had sustained multiple crushing injuries. Dietrich believed that the concrete and knife that were found near the body were, respectively, consistent with the head injuries and the stab wounds. The doctor further confirmed the presence of spermatozoa inside the victim. According to Dietrich, the body exhibited no signs of forceful sex, or any signs of forceful grabbing of the limbs or. torso. Finally, Dietrich opined that the stab wounds had been inflicted prior to the head blows, which were the cause of death. Dietrich explained that the nature of the stab wounds were such that they would have had to occur before the head blows. Dietrich concluded that the victim would have been able to walk and talk after being stabbed.

The State next presented Jenny Cook, a friend of the defendant. Cook stated that the defendant and his friend, Dennis Sperow, were staying at her house in the time frame of the incident. On June 10, 1986, according to Cook, the defendant had left for work at approximately 5 p.m. Sperow stayed behind at Cook's apartment drinking beer and whiskey. The defendant returned from work at approximately 11:15 p.m. and joined in the drinking. Cook's friend, Tina Hulett, was also present at this point in time. At about 2:45 a.m., the two men left, and Cook and Hulett retired for the evening. Cook believed that the two men were going to a bar to purchase additional liquor. Cook heard the two men return to her house at approximately 6 a.m. Cook stated that the defendant asked her if she wanted to party, but Cook indicated she did not. On cross-examination, Cook admitted she did not recall telling Detective Castleman that it was Sperow who tried to wake her at 6 a.m.

Tina Hulett testified, largely corroborating the statements of Cook. Hulett indicated she had known the defendant for three years and believed the defendant and Sperow were friends. Hulett further added that when she awoke on the morning of June 10 at approximately 7 a.m., she noticed what appeared to be a spot of blood on the stairs. Hulett claimed the spot had not been there before that time.

Joey Bilyeu, a co-worker and friend of the defendant, testified she met Sperow through the defendant approximately one month before the incident. On June 10, 1986, at approximately 8 a.m., the defendant and Sperow appeared at Bilyeu's apartment. Bilyeu's apartment was located approximately four miles from that of Cook. Bilyeu recalled that the defendant was wearing corduroy pants, while Sperow was wearing blue jeans and had no shoes on. Neither the defendant nor Sperow appeared to be nervous, scared, or intoxicated. At about

8:30 a.m., the defendant and Sperow borrowed Bilyeu's car. They dropped her off at work and returned to pick her up later that afternoon. At this time, the defendant, Sperow, and Bilyeu left Springfield in Bilyeu's car and headed north on Interstate 55 towards Bloomington. They went specifically to pick up and fix the defendant's car, which had a flat tire. After doing so, the three returned to Springfield. The defendant and Bilyeu dropped Sperow off at the hospital and then parted company.

Terry Castleman of the Sangamon County sheriff's office testified that on June 10 and 11 of 1986, he and Springfield police officer Tom Murphy took two statements from the defendant. The defendant's first statement was taken at about 8 p.m. on June 10. According to the defendant, during the late evening hours of June 9, he got off work, went to Cook's apartment, ate and drank with Sperow, Cook and Hulett, and then left the apartment with Sperow. While driving in town, the defendant and Sperow went to the area known to be frequented by prostitutes. There, the two men saw a young black female, stopped her, talked to her, and agreed to pay her $50 to have sex with both of them. The girl, known as "Ebony," got into the car, and the three drove out toward the country. During the drive, Sperow and Ebony got into a dispute, and Sperow tried to pull Ebony into the backseat of the car.

According to the defendant, when the three arrived at the isolated rural area, he and then Sperow had sexual intercourse with Ebony. While Sperow was with the woman, the defendant heard Ebony scream and saw her run away from Sperow. The defendant did not indicate to Castleman that he had seen the stabbing occur. The defendant approached Ebony, who told him that she had been stabbed. She asked the defendant to protect her from Sperow. The defendant then walked toward Sperow, who ran by him with a large concrete block in his hands. The defendant next heard Sperow hit Ebony in the face six or seven times with the block. The defendant immediately got into his car and attempted to leave the scene without Sperow. Sperow, however, jumped into the car and told defendant not to leave him behind. Upon Sperow's request, the defendant drove to Lake Springfield, where Sperow jumped into the lake to wash the mud and blood off of him. The defendant also waded into the water up to his waist and threw his shoes into the lake.

The defendant next told Castleman that they drove to Cook's house. On the way there, Sperow used the defendant's T-shirt to wipe down the inside of the car, which had blood and dirt on it. Sperow threw the shirt out the window. Once at Cook's apartment, Sperow

told the defendant to wash both men's clothes. The defendant complied.

Later that morning, according to the defendant, the men drove north towards Bloomington, but the defendant's car suffered a flat tire. At this point in time, the men hitched a ride back to Springfield. They went to Bilyeu's house, borrowed her car and spent much of the afternoon trying to fix the defendant's car. The defendant then dropped Sperow at the hospital and went to the home of his stepfather, William Bunch.

After speaking with the defendant, Castleman inspected the defendant's car. He saw a red spot in the middle of the front seat, and also noticed that the car appeared to have been cleaned. Castleman then went to Cook's house, where he recovered clothing believed to belong to Sperow and observed a spot of blood on the stairs. Castleman also recovered a pair of dirty blue jeans from behind the washing machine which the defendant identified as his own. Castleman then searched unsuccessfully for the T-shirt which had allegedly been thrown out of the car window.

Castleman and Murphy then returned to the detective bureau to speak with the defendant. They indicated to the defendant that his story "did not quite fit" because his pants were soiled, and because both officers had been trained in blood spatter interpretation. The blood allegedly found on defendant's pants did not support the statements given. The defendant then began to tell his story again. This time, the defendant stated he witnessed the stabbing. Immediately thereafter, he chased Ebony and tackled her. He then struck her and straddled her before Sperow approached and dropped the cement on her head. According to Castleman, the defendant indicated that he was holding Ebony down when Sperow dropped the cement block.

During trial, the prosecution played the tape recording of the defendant's second statement. The taped statement reflected that the defendant had told Castleman he was standing in front of Ebony preparing to receive oral sex when Sperow stabbed her. The defendant stated that he chased her because he was scared after the stabbing. He straddled her in an effort to calm her down. The defendant further claimed that he grabbed and held her hands down only to protect himself and he struck her only to quiet her down. The defendant stated that he was shocked and surprised when Sperow hit her with the rock and he ran from her as Sperow continued to hit her with the rock. The defendant claimed the men never, at any point in time prior to or during the incident, discussed the possibility of killing Ebony.

Detective Murphy also testified on behalf of the prosecution,

largely corroborating the testimony of Castleman. Murphy specifically recalled that the defendant indicated the source of the dispute between Sperow and Robinson during the drive was Sperow's possession of a knife. Defendant told the officers that Sperow pulled a knife on Robinson during the drive and the defendant told Sperow to "knock it off."

Phillip Sallee, a forensic serologist with the State crime lab, testified about the various pieces of physical evidence recovered from the scene. According to Sallee, semen was present in the vagina and rectum of the victim. The defendant's pants contained no blood, but did contain a head hair consistent with that of the victim. Sperow's pants likewise exhibited no blood. There was no blood found on the knife, but blood was found on the large piece of concrete. Sallee indicated that the washing of clothing or walking through water while wearing clothing might or might not wash bloodstains out, depending upon a multitude of factors. This was the sum of the State's case in chief.

The defendant testified in his own behalf. He acknowledged that he was an acquaintance of Sperow. He stated he first met Sperow in mid-May of 1986 when he picked up Sperow, who was hitchhiking on the highway. Sperow returned to Springfield with the defendant and stayed with the defendant and Bilyeu in Bilyeu's apartment. On June 9, at approximately 11:30 p.m., the defendant went to Cook's apartment after work. There, he found Sperow, Cook and Hulett drinking. The four ate and drank until approximately 2:50 a.m. when the defendant and Sperow left to buy more liquor. According to the defendant's testimony, the two men went to an area where prostitutes were known to frequent, saw a prostitute, and agreed to pay her $50 for sex. The woman got into the car and the three proceeded out toward 31st Street. During the drive, Sperow pulled out a knife and was taunting the woman. The defendant told Sperow to put the knife away. Sperow apparently did so, and then jumped into the backseat of the car. After the defendant parked the car, the woman asked for her money. The defendant indicated that he had no money and believed that Sperow would pay because he had recently received a paycheck. Sperow, however, indicated he had no money. After Sperow and the woman had a struggle, the defendant and then Sperow had sex with the woman.

The defendant testified that after he had sex with the woman he returned to the car and was drinking whiskey. While standing near the car, the defendant stated that he heard some noise but did not do anything. The defendant stated he was not aware Sperow still possessed the knife until the woman approached him and informed him that she had been stabbed. The woman then took off running, and Sperow told the defendant to chase her. The defendant did in fact chase the woman

and tackle her. He stated that she attempted to hit him and he slapped her. The defendant claimed the woman was hysterical. She asked him to protect her from Sperow. The defendant then went back toward Sperow to retrieve the knife, but Sperow ran past with a large object in his hand. The defendant claimed he was approximately three to four feet away and could do nothing to stop Sperow from crushing the woman's head. The defendant stated he could feel the vibrations of the ground as Sperow continued to hit the woman over and over. According to the defendant, the lighting conditions in the area were "hazy." The defendant estimated that the total time frame during which the woman was killed was approximately 45 seconds.

The defendant then went to his car and attempted to leave the area, but Sperow jumped in as he began to drive away. Sperow told the defendant to take him to some water. The defendant drove to Lake Springfield. The defendant walked waist-deep into the water and Sperow dove in. Sperow used the defendant's shirt to wipe the inside of the car and then threw the shirt out the window. The men then went through a car wash and further cleaned the defendant's car.

The defendant indicated that they then proceeded to Cook's house, where he washed the men's clothes. Sperow then began to mess with Cook and Hulett, at which point the defendant became more scared. The defendant testified he wanted to get Sperow away from the women. As a result, the defendant and Sperow then headed toward Bloomington, where the defendant's family lives. However, while en route, the defendant's car suffered a flat tire and the men hitchhiked back to Springfield. The defendant next stated that he went to the home of his stepfather, William Bunch. The defendant told Bunch of the murder and that he needed to turn Sperow in. The defendant and Bunch then proceeded to Allin's residence and directed Allin to the body's location. The defendant was subsequently taken to the police station. The defendant claimed he never told Castleman and Murphy that he held the victim down or that he had straddled her. The defendant claimed that when he signed the transcript of his taped statement, he was groggy and did not realize what he was signing. The defendant reiterated that he had neither intended to nor caused physical harm to the victim and that he had not held the victim down so Sperow could drop the concrete on her head.

During cross-examination, the defendant admitted that he continued to remain with Sperow after the incident occurred, that he intended to have sex with the girl despite having no money, and that he had no idea Sperow had a knife when they initially picked up the girl. The defendant reiterated that he heard Sperow and the girl scuffling,

that he did not see the actual stabbing, and that Sperow told him to go get the girl. The defendant claimed he could not recall having told Castleman and Murphy that, at the time of the stabbing, he was standing in front of the victim preparing to receive oral sex. The defendant was also not certain if the initials on the transcript of the taped statement had actually been made by him. The defendant did not believe that he had made inconsistent statements to the various officers and claimed that it was a very confusing evening.

In rebuttal, the State presented Officer Castleman. Castleman stated that the defendant had read the transcript of his taped statement for approximately one hour. He claimed the defendant initialled each page and made various corrections in the statement. The defendant then signed the statement and returned it to Castleman.

Following deliberation, the jury returned verdicts of guilty for murder, aggravated battery, aggravated unlawful restraint, and obstructing justice. The defendant's convictions were based upon a theory of accountability. The defendant later received prison terms of 30, 5, and 4 years, and 1 year, respectively.

■■ The defendant initially argues that the State failed to prove his guilt beyond a reasonable doubt. Specifically, the defendant maintains: there was no showing of any preconceived plan or intent to kill the woman; he cooperated with law enforcement officials after the incident; and there was insufficient evidence adduced to show actual participation in the incident.

The standard of review in criminal convictions is well established. A conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.) In assessing the evidence upon review, the relevant question is whether, after viewing such evidence in a light most favorable to the prosecution, any rational trier of fact might have found the essential elements of the crime charged beyond a reasonable doubt. (*Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 276, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; see also *People v. Banks* (1985), 138 Ill. App. 3d 994, 486 N.E.2d 953.) A jury's determination of guilt will not be set aside unless the evidence is so improbable, unsatisfactory or unreasonable as to warrant a reasonable doubt as to the defendant's guilt. *Banks*, 138 Ill. App. 3d at 1005, 486 N.E.2d at 961.

In order to establish guilt based upon a theory of legal accountability, the State must prove beyond a reasonable doubt: (1) the defendant

solicited, aided, abetted, agreed, or attempted to aid another person in the commission of an offense; (2) such participation must have taken place either before or during the commission of the offense; and (3) such participation was with the concurrent, specific intent to promote or facilitate the commission of the offense. (See Ill. Rev. Stat. 1985, ch. 38, par. 5—2(c); *People v. Perez* (1985), 108 Ill. 2d 70, 483 N.E.2d 250, *cert. denied* (1986), 474 U.S. 1110, 88 L. Ed. 2d 931, 106 S. Ct. 898.) Although mere presence at the scene of an offense or mere acquiescence in another's actions is ordinarily insufficient to establish accountability, one may be held to aid and abet without physically participating in the overt act. *People v. Young* (1983), 116 Ill. App. 3d 984, 994, 452 N.E.2d 718, 724.

■ Contrary to the defendant's assertions, it need not be shown that the defendant had a specific intent to kill or participated in a preconceived plan to commit murder. Under the well-established "common design rule," if several individuals conspire to commit an unlawful act and a death occurs during the prosecution of the common objective, all participants are guilty of murder. (*People v. Terry* (1984), 99 Ill. 2d 508, 514, 460 N.E.2d 746, 749, quoting *Brennan v. People* (1854), 15 Ill. 511, 516-17.) Express words of agreement are not essential to establish such a common purpose. A common design can be inferred from the circumstances surrounding the perpetration of the unlawful conduct. *Banks*, 138 Ill. App. 3d at 1004-05, 486 N.E.2d at 961.

Circumstances especially pertinent to the establishment of a common design include: presence at the scene of the crime without disapproval or opposition (*People v. Cleveland* (1986), 140 Ill. App. 3d 462, 469, 488 N.E.2d 1276, 1281); a continued close association with perpetrators after the criminal act (*People v. Ray* (1979), 80 Ill. App. 3d 151, 156, 399 N.E.2d 977, 981); a failure to report the incident to the authorities (*Ray*, 80 Ill. App. 3d at 157, 399 N.E.2d at 982); and/or the subsequent concealing or destroying of evidence of the crime (*People v. Ruiz* (1982), 94 Ill. 2d 245, 256, 447 N.E.2d 148, 152, *cert. denied* (1983), 462 U.S. 1112, 77 L. Ed. 2d 1341, 103 S. Ct. 2465, *rehearing denied* (1983), 463 U.S. 1236, 77 L. Ed. 2d 1452, 104 S. Ct. 31). The existence of a common design is a question of fact for the jury.

■ Evidence herein indicated that the defendant was at the scene of the murder and made no attempt to interfere. In fact, testimony from law enforcement officers indicated that the defendant admitted witnessing the stabbing and straddling the victim as Sperow administered the fatal blows. The defendant remained with Sperow for almost 12 hours after the incident. He participated in numerous acts to destroy evidence of the criminal act, including driving to Lake Spring-

field to rinse off in the lake water, cleaning the interior and exterior of the car, and washing the clothing of both men.

The defendant gave five statements to police officers after he reported the incident. With each additional statement given, the defendant implicated himself to a more serious degree. At trial, however, the defendant denied making these statements. A mere conflict in testimony at trial is insufficient to establish a reasonable doubt of guilt. (*People v. Adams* (1985), 109 Ill. 2d 102, 485 N.E.2d 339, *cert. denied* (1986), 475 U.S. 1088, 89 L. Ed. 2d 730, 106 S. Ct. 1476; *People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.) It is the responsibility of the trier of fact to assess the credibility of the witnesses, and where evidence is conflicting, a court of review should not substitute its judgment for that of the trier of fact unless it is shown to be manifestly erroneous. *Adams*, 109 Ill. 2d 102, 485 N.E.2d 339; *Akis*, 63 Ill. 2d 296, 347 N.E.2d 733.

■ Defendant raises specific objections to his unlawful restraint conviction alleging that evidence presented was insufficient to prove an intent and motive to detain the woman. Defendant claims he was merely attempting to calm the woman down and protect himself. Evidence presented, however, clearly showed defendant intended to restrain the woman. He tackled the woman, slapped her and straddled her as Sperow approached and fatally wounded the woman. (See *People v. Kuykendall* (1982), 108 Ill. App. 3d 708, 439 N.E.2d 521.) Based on an extensive review of the record presented here, the defendant's convictions for murder, aggravated battery, aggravated unlawful restraint, and obstructing justice were supported by evidence beyond a reasonable doubt.

■ The defendant next contends that the court erred in denying his motion to reconsider or reduce the sentence imposed. Specific error is assigned to the fact that the court did not consider defendant's subsequent role in Sperow's trial as a factor in mitigation. Based upon our review of the record, however, we disagree.

At the sentencing hearing, the defendant's cooperation with the police and intent to testify were presented to the court as mitigating circumstances. The court expressly noted it would consider all evidence received during trial as well as the presentence report filed. At the hearing on defendant's motion to reduce, the court again reiterated:

"[L]et me state very clearly for the record that at the time of Mr. Watts' sentencing hearing, Mr. Watts stood up and said in open Court that he was willing to testify against Mr. Sperow, and he intended to testify, and he intended to cooperate. The

Court was aware of the circumstances at that time. ***

[W]hen I considered his sentence originally, the sentence that I imposed was based upon my, at least, thought that he would be testifying at a trial—a subsequent trial involving Mr. Sperow, and I took that matter into account at the time that I imposed his sentence, and I don't intend to reconsider the sentence at this point in time, because as I say, I already had considered that factor when his sentence was imposed ***."

The fact that the State made no opposition to the motion and may well have presented the defendant in a different light during the Sperow trial was irrelevant to the court's sentence as originally imposed.

It is well established that the determination and imposition of sentence is a matter which involves considerable judicial discretion. (*People v. Jones* (1986), 142 Ill. App. 3d 51, 491 N.E.2d 515.) There is a strong presumption that a sentence imposed at the trial court level is based upon sound legal reasoning. Consequently, absent an abuse of discretion by the trial court in imposing the sentence, it will not be altered upon review. (*People v. Steppan* (1985), 105 Ill. 2d 310, 473 N.E.2d 1300; *Jones*, 142 Ill. App. 3d 51, 491 N.E.2d 515.) The trial court herein properly considered all appropriate facts and circumstances. There was no abuse of discretion.

Furthermore, the defendant's claim that his conduct subsequent to the imposition of sentence is a proper factor in mitigation is clearly without merit. As noted by the court in *People v. Corby* (1985), 139 Ill. App. 3d 214, 487 N.E.2d 374, a defendant's subsequent rehabilitation is an improper factor in support of a reduction of sentence. Where the court originally takes into account the defendant's potential for rehabilitation during sentencing, the fact that such rehabilitation occurs is not a proper cause for a reduction in sentence. (*Corby*, 139 Ill. App. 3d at 221, 487 N.E.2d at 378.) Such conduct is more appropriately a consideration for the Department of Corrections in determining parole. *Corby*, 139 Ill. App. 3d at 221, 487 N.E.2d at 378.

Based upon the foregoing, the judgment of the circuit court of Sangamon County is affirmed.

Affirmed.

KNECHT and SPITZ, JJ., concur.